# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Fulton, Fulton County   :
Board of Elections, Stuart L. Ulsh, in   :
his official capacity as County   :
Commissioner of Fulton County and in   :
his capacity as a resident, taxpayer   :
and elector in Fulton County, and   :
Randy H. Bunch, in his official   :
capacity as County Commissioner of   :
Fulton County and in his capacity as   :
a resident, taxpayer and elector of   :
Fulton County,   :
                 Petitioners   :
  :
          v.   :   No. 277 M.D. 2021
  :   Argued: May 8, 2024
Secretary of the Commonwealth,   :
                 Respondent   :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
            HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge
            HONORABLE LORI A. DUMAS, Judge
            HONORABLE STACY WALLACE, Judge
            HONORABLE MATTHEW S. WOLF, Judge


OPINION BY
PRESIDENT JUDGE COHN JUBELIRER       FILED: December 31, 2024


Before the Court in its original jurisdiction are the Application for Summary Relief and Incorporated Memorandum of Law filed by the Secretary of the Commonwealth (Secretary's Application) and Petitioners'[1] Combined Dispositive

---

[1] The Petitioners are County of Fulton, Fulton County Board of Elections, Stuart L. Ulsh, in his official capacity as County Commissioner of Fulton County and in his capacity as a resident, **(Footnote continued on next page…)**

Motion and Brief (County's Application) (collectively, the parties' Cross-Applications).

The primary legal questions in this case, set forth in Count III of the Amended Petition for Review, "concern[] the complex balance of state and local power over elections and the equipment used in election administration," *County of Fulton v. Secretary of the Commonwealth*, 292 A.3d 974, 1012 (Pa. 2023) (*Fulton County II*),[2] and can be summarized as follows. First, does Section 1105-A of the Pennsylvania Election Code[3] (Election Code) empower the Secretary to issue directives instructing county boards of elections not to allow an unauthorized third-party access to their voting equipment under risk of decertification of the voting equipment? And second, in issuing such a directive, does the Secretary usurp the powers and duties of county boards of elections as set forth in Section 302[4] of the Election Code? The Election Code requires that we answer the first question yes, and the second question no. In addition, the Secretary has demonstrated that it owes no obligation to reimburse county boards of elections for decertified voting equipment (Count IV). Further, because Fulton County no longer intends to use the voting equipment at issue in this case, Counts I and II, which seek relief specific to the recertification of those machines, are moot. It necessarily follows that, given our

---

taxpayer, and elector in Fulton County, and Randy H. Bunch, in his official capacity as County Commissioner of Fulton County and in his capacity as a resident, taxpayer, and elector of Fulton County. The Court refers to Petitioners, collectively, as either Petitioners or the County, consistent with our Supreme Court's opinion in *County of Fulton v. Secretary of the Commonwealth*, 292 A.3d 974, 1012 (Pa. 2023) (*Fulton County II*), and the parties' filings.

[2] The United States Supreme Court denied a petition for writ of certiorari filed by Petitioners. *See Fulton County, Pennsylvania v. Secretary of the Commonwealth of Pennsylvania*, 144 S. Ct. 283 (2023).

[3] Act of June 3, 1937, P.L. 1333, *as amended*, added by Section 4 of the Act of July 11, 1980, P.L. 600, 25 P.S. § 3031.5.

[4] 25 P.S. § 2642.

2

reasoning as to the other counts of the Amended Petition for Review and the County's representations that it no longer intends to use the electronic voting system (EVS) at issue in this matter, the Democracy Suite 5.5A Election Management System (Voting Equipment), the County's request for injunctive relief in furtherance of its claims set forth in Count V is similarly moot.

Consistent with that reasoning, and as fully detailed below, we grant the Secretary's Application, deny the County's Application, and enter judgment in favor of the Secretary on Counts III and IV and dismiss Counts I, II, and V as moot.

## I.    BACKGROUND

We briefly summarize the pertinent facts.[5]  Fulton County leased the Voting Equipment from Dominion Voting Systems, Inc. (Dominion) in April 2019, and it used that Voting Equipment for the 2019 municipal and 2020 primary and general elections.  *Fulton County II*, 292 A.3d at 979.  Following the November 2020 election, two of Fulton County's Commissioners, Stuart L. Ulsh and Randy H. Bunch, enlisted an entity called Wake Technology Services, Inc. (Wake TSI) "to analyze aspects of the November 2020 election in Fulton County."  *Id.* at 980. During its inspection, Wake TSI took various types of data, including "digital images of scanned ballots," "pictures of the paper Mail-in ballots[,]" and "electronic copies of [Election Management System (]EMS[)] application log files," from the Voting

---

[5] The factual background of this matter has been set forth in *Fulton County II* and *County of Fulton v. Secretary of the Commonwealth* (Pa., No. 3 MAP 22, Mem. Op. & Prelim. Appointment Order of Special Master, filed Sept. 15, 2023).  That factual background is incorporated herein by reference.  In *Fulton County II*, the Supreme Court explained that its recitation of the facts, upon which we rely here, "is based upon matters over which we may take judicial notice, and/or undisputed assertions of fact substantiated by the parties' pleadings and attachments in the underlying litigation, the interlocutory appeal, and the[] sanction proceedings. Our recitation finds further support in the Special Master's [factual findings]." *Fulton County II*, 292 A.3d at 979 n.3.

3

Equipment and issued a report. *Id.* (citation omitted). Upon discovering that the County had allowed third-party access to the Voting Equipment, the Secretary issued Directive 1 of 2021 (Directive 1),[6] having determined that such third-party access would lead to chain of custody issues and cause security problems. In Directive 1, the Secretary noted that third-party access "'negate[s] the ability of electronic voting system vendors to affirmatively state that such systems continue to meet Commonwealth Security standards, are validated as not posing security risks, and are able to be certified to perform as designed' by the vendor." *Id.* (quoting Directive 1 at 2-3 ¶ 2). Paragraph 3 of Directive 1 provides as follows:

> a. County [b]oards of [e]lections shall not provide physical, electronic, or internal access to third parties seeking to copy and/or conduct an examination of state-certified electronic voting systems, or any components of such systems . . . .
>
> b. If access described in Paragraph 3.a. occurs, those pieces of voting equipment will be considered no longer secure or reliable to use in subsequent elections. As a result, the Department of State [(Department)] will withdraw the certification or use authority for those pieces of the county voting system. . . .
>
> c. The Commonwealth of Pennsylvania will not reimburse any cost of replacement voting equipment for which certification or use authority has been withdrawn pursuant to this directive.

*Id.* at 981 (quoting Directive 1 at 2 ¶ 3).

Per Directive 1, county boards of elections must also immediately notify the Secretary "upon receipt of any written or verbal request for third-party access to [] [Voting Equipment], or any component thereof"; both county boards of elections and voting system vendors must also notify the Secretary in the event of "any breach or attempted breach in the chain of custody of its voting system components." *Id.*

---

[6] Directive 1 is Exhibit F to Petitioners' Original Petition for Review but is not appended to the Amended Petition for Review, although it is referenced therein as being attached.

4

(quoting Directive 1 at 2 ¶ 4). The Secretary determined that the Wake TSI inspection had "compromised" Fulton County's Voting Equipment, such that it could not be used in future elections, and so the Secretary decertified it. *Id.* (quoting Petition for Review, Ex. H).

The County then brought this action against the Secretary,[7] "challeng[ing] the Secretary's authority to promulgate Directive 1 and s[eeking] vacatur or reversal of the Secretary's decertification of the County's [V]oting [E]quipment and/or its denial of [the] County's access to state funds to cover the costs of replacing the decertified equipment." *Id.*

> The County assert[s] in Count I that the decertification was "arbitrary, capricious, and legally improper, and an error of law, as [the Secretary] failed to comply with the mandates of 25 P.S. § 3031.5(b)" by not conducting a physical reexamination of [Fulton] County's [Voting Equipment] before decertifying it.[] [(Am. Pet. for Rev. ¶ 49.)] The County assert[s] that, if the Secretary "had conducted the mandated reexamination of" [Fulton] County's [Voting Equipment], it "would have found that" the [Voting Equipment] "continued to meet" the Election Code's security requirements.[] [(*Id.* ¶ 48.)]
>
> In Count II, the County s[eeks] a declaratory judgment that the County has authority to allow a third-party vendor to examine and analyze its [Voting Equipment].[] The County contend[s] that, by "forbid[ding] any use of third-party vendors to conduct an examination of various components of" its [Voting Equipment] and doing so six months *after* the County "engaged Wake TSI to assist [the County] in conducting its 'analysis,'" the Secretary contradicted the Secretary's own 2016 and 2020 guidance documents.[] [(*Id.* ¶¶ 52-57.)] These documents, the County argue[s], generally anticipated counties' use of third-party vendors, and the County assert[s] that the "analysis and investigation of [the Voting Equipment] with the assistance of Wake TSI was conducted in accordance with the requirements of the [Election Code] as well as the [Secretary's] then-current Guidance."[] [(*Id.* ¶ 64.)]

---

[7] The County filed its initial Petition for Review in August 2021, and subsequently an Amended Petition for Review in September 2021.

5

Count II conclude[s] with the following prayer for relief:

> Petitioners respectfully request that this Honorable Court enter an Order declaring that Petitioners . . . complied with the requirements of the Election Code and the Guidance issued by [the Secretary] in retaining and utilizing [Wake TSI] to assist [them] in conducting an analysis of Fulton County's [Voting Equipment], and further declaring that any finding to the contrary by [the Secretary] should be stricken[,] and further declaring the July 20, 2021 decertification by the Secretary null and void and of no effect . . .[]

[(*Id.*, Count II, Wherefore Clause.)] This aspect of the pleading dovetail[s] with [the] County's claim that, had the Secretary inspected the [V]oting [E]quipment before decertifying it, the Secretary would have found that it continued to meet the Election Code's requirements for certification. . . .

In Count III, the County s[eeks] declaratory judgment to the effect that, in issuing Directive 1, the Secretary usurped the County's Board of Elections' "power . . . to conduct a systematic and thorough inspection" of its elections with the assistance of third-party entities.[] [(*Id.* ¶ 73.)] In Count IV, the County s[eeks] a declaration that the Secretary lacks authority to withhold funds from [Fulton] County to purchase replacement machines.[] [(*Id.* ¶¶ 74-79; Count IV, Wherefore Clause.)] In Count V, the County s[eeks] injunctive relief in furtherance of the foregoing claims.[] [(*Id.* ¶¶ 80-88; Count V, Wherefore Clause.)]

*Fulton County II*, 292 A.3d at 982-83 (footnotes omitted, some alterations added). The Secretary demurred to Count III of the Amended Petition for Review on October 18, 2021, and briefing on that preliminary objection concluded on February 2, 2022. On May 23, 2022, a panel of this Court overruled the Secretary's demurrer to Count III of the Amended Petition for Review. *County of Fulton v. Sec'y of the Commonwealth*, 276 A.3d 846 (Pa. Cmwlth. 2022) (*Fulton County I*). The panel explained that, at that point, it was "not clear" "[w]hether prevention" of "[t]ampering with election equipment" "is the responsibility of the Secretary or the

6

county boards of elections, or both[.]" *Id.* at 861. The panel said that "we cannot say with certainty at this juncture that Count III does not state a claim" and overruled the preliminary objection. *Id.*

While the Amended Petition for Review remained pending, the Secretary learned that the County planned to allow another third party, an entity called Envoy Sage, to inspect the Voting Equipment. *Fulton County II*, 292 A.3d at 978, 984. The Secretary sought emergency relief in this Court on December 17, 2021, requesting that the County be enjoined from providing access to third parties. *Id.* at 984. After several intervening orders and negotiations, the Secretary filed a renewed request for emergency relief, which the Court denied hours before the Envoy Sage inspection was to take place on January 14, 2022. *Id.* at 986. The Secretary sought a stay of that order with the Supreme Court, which, by single-Justice order, was granted on January 14, 2022 "to preserve the *status quo* pending review by the full court." *Id.* at 987-88. On January 27, 2022, the full Supreme Court extended the stay (Injunction Order) pending resolution of the Secretary's appeal. *Id.* Meanwhile, the Secretary asked the Supreme Court to find the County in contempt of the Injunction Order, informing the Supreme Court that the County had allegedly violated the Injunction Order in July 2022 by allowing access to the Voting Equipment to an entity called Speckin Forensics (Speckin). Speckin's investigation came to light because the County, in separate litigation against Dominion in the Court of Common Pleas of the 39th Judicial District, Fulton County branch, attached Speckin's report, detailing "a highly intrusive examination of [Fulton] County's [V]oting [E]quipment." *Id.* at 992. The Supreme Court then appointed a Special Master to make findings of fact regarding the County's alleged violation of the Supreme Court's Injunction Order and to recommend what sanctions might be appropriate.

*Id.* The Special Master held hearings in November 2022, later issuing findings of fact and conclusions of law with respect to the factual background surrounding, what the Special Master found to be, the County's violation of the Supreme Court's Injunction Order and recommending appropriate sanctions. *See id.* at 999-1010.

The Supreme Court subsequently issued its opinion regarding contempt and sanctions. The Supreme Court "agree[d] with the Special Master that the County deliberately, willfully, and wrongfully violated th[e] [Supreme] Court's [Injunction O]rder when it allowed Speckin to inspect the [V]oting [E]quipment, the condition of which is material to the underlying litigation," and so, the Supreme Court held the County in contempt. *Id.* at 1010. The Supreme Court also agreed with the Special Master that the sanctions of attorney's fees and impoundment of the Voting Equipment (at the County's expense) were warranted. *Id.* at 1011. Regarding the propriety of impoundment, the Supreme Court explained:

> Taking the County at its word, it is unclear what prejudice impoundment would cause. The County insists, with increasing volume as this case has evolved, that it has no interest in the [Voting] [E]quipment that it now identifies as "defunct." Further, it disclaims any intention to use the [Voting E]quipment again. And the County provides no specific reason why the [Voting E]quipment would have any value to assessing the security of future elections using other companies' products. Any other utility would be associated with the County's other litigation interests, which can be dealt with as they arise; they are of no moment to the issue at hand.

*Id.* at 1011-12. In addition, the Supreme Court agreed with the Special Master that dismissal of the Amended Petition for Review would not be an appropriate sanction, noting that doing so "would cross the line between a coercive and punitive sanction, which lies outside the bounds of a civil contempt proceeding." *Id.* at 1012. The Supreme Court further explained that, while there were some fact-based claims,

8

there were important questions of law as to the Secretary's statutory authority and "the complex balance of state and local power over elections" that could be resolved without reference to "the compromised evidence." *Id.* Finally, the Supreme Court declined to adopt the Special Master's recommendation that "to the extent any fact relating to the effect of any inspection on the [] Voting Equipment is or becomes relevant in the underlying litigation, that fact will be conclusively established in the Secretary's favor." *Id.* (quotation marks omitted).

The Special Master, pursuant to *Fulton County II*, after a hearing, ordered the Voting Equipment to be impounded with a neutral third-party escrow agent. *County of Fulton v. Sec'y of the Commonwealth* (Pa., No. 3 MAP 2022, Pa. Cmwlth., No. 277 M.D. 2021, Mem. Op. & Final Appointment Order of Special Master, filed Oct. 27, 2023), *appl. for relief & rev. denied*, (Pa., No. 3 MAP 2022, filed Feb. 21, 2024); *County of Fulton v. Sec'y of Commonwealth* (Pa., No. 3 MAP 2022, Pa. Cmwlth., No. 277 M.D. 2021, Mem. Op. & Prelim. Appointment Order of Special Master, filed Sept. 15, 2023). The Voting Equipment was transferred to that escrow agent on January 19, 2024.

On December 19, 2023, the Court, noting that we had overruled the Secretary's preliminary objection in *Fulton County I*, ordered the parties to file either dispositive motions, partial dispositive motions, or a status report indicating why no such motion should be filed. (Order, 12/19/2023.) On February 16, 2024, the parties filed the Cross-Applications.[8]

_____

[8] The Secretary filed an answer to the County's Application on March 18, 2024. On April 3, 2024, the Secretary filed an "Application to Supplement the Summary-Relief Record with Additional Evidence" (Application to Supplement), to which this Court directed an answer by April 10, 2024. The County, on April 9, 2024, sought an extension of time to file its answer to the Secretary's Application to Supplement, which this Court granted in part, requiring an answer by April 15, 2024. However, the County filed no answer, and so we granted the Application to **(Footnote continued on next page…)**

9

This Court, sitting in *en banc*, heard argument on the Cross-Applications on May 8, 2024. Now fully briefed and argued, the Cross-Applications are ripe for disposition.

## II.    DISCUSSION
### A.    *Legal Standard*

Pennsylvania Rule of Appellate Procedure 1532(b), governing applications for summary relief, provides that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter, the court may on application enter judgment if the right of the applicant thereto is clear." Pa.R.A.P. 1532(b). In ruling on a summary relief application, we "view[] the evidence in the light most favorable to the non-moving party[] and enter[] judgment only if there is no genuine issue as to any material fact and the right to relief is clear as a matter of law." *Hosp. & Healthsystem Ass'n of Pa. v. Commonwealth*, 77 A.3d 587, 602 (Pa. 2013). We consider a fact "material if its resolution could affect the outcome of the case under the governing law." *Id.* Questions about the interplay among statutes present pure questions of law. *Mech. Contractors Ass'n of E. Pa. v. Dep't of Educ.*, 934 A.2d 1262, 1269 & n.9 (Pa. 2007).

---

Supplement on April 17, 2024. Later that evening, the County filed a "Motion for Reconsideration of April 17, 2024 [Order] Granting the Secretary's Application to Supplement the Record" (Application for Reconsideration), which did not contain an application seeking any specific relief, but rather a brief addressing the Secretary's Application on the merits. The Secretary filed an answer to the Application for Reconsideration, and we denied the Application for Reconsideration on April 23, 2024. To the extent the Application for Reconsideration was an attempt on the part of the County to belatedly file an answer to the Secretary's Application to Supplement, we will not consider it, as the County did not file an answer and did not request an extension of time to do so.

B.    *Whether the County is barred from seeking equitable relief under the doctrine of unclean hands.*

We turn first to the Secretary's potentially dispositive argument that we should decline to address the County's Amended Petition for Review under the equitable doctrine of unclean hands.

### 1.    Arguments

The Secretary suggests that the entire petition for review should be dismissed under the doctrine of unclean hands, which requires that a person "seeking equity act fairly and without fraud or deceit as to the controversy in issue." (Secretary's Appl. at 83 (quoting *Mazzitti & Sullivan Counseling Servs., Inc. v. Dep't of Pub. Welfare*, 7 A.3d 875, 882 (Pa. Cmwlth. 2010) (citation omitted)).) Unclean hands applies here, according to the Secretary, because declaratory and injunctive relief—the relief sought in this case—are equitable in nature.

Turning to the facts, Secretary first points out, citing the Special Master's report, that the entire action is based on a "falsehood" because the Wake TSI inspection was not authorized by the Fulton County Board of Elections but rather by Bunch and Ulsh as individuals. Conduct that deceives the court calls for the application of the doctrine. (Secretary's Appl. at 85.) However, the Secretary also points to the conduct during the litigation. Most relevant here, the Secretary reminds us that the County "deliberately, willfully, and wrongfully violated the [Supreme] Court's [Injunction O]rder when [it] allowed Speckin to inspect the [V]oting [E]quipment." (*Id.* at 87 (quoting *Fulton County II*, 292 A.3d at 1010, 1018 (describing County's behavior as "relentlessly dilatory, obdurate, vexatious, and [in] bad faith")) (some alterations added).) The Secretary summarizes this argument as follows:

> [W]hile asking the courts to permit them to turn their electronic voting machines over to third parties—overriding the Secretary's July 20, 2021[] prohibition and Directive 1—Petitioners then **secretly** and **willfully violated** [the Injunction Order] by the Supreme Court of Pennsylvania **prohibiting** them from doing just that. It is difficult to imagine inequitable, bad-faith conduct more directly related to the claims at issue. This is a paradigmatic case for the doctrine of unclean hands.

(*Id.* (emphasis in original).)

At oral argument, the County argued that unclean hands should not apply because all county boards of elections deserve clarity on the boundaries between the authority of county boards of elections and the Secretary.

### 2. Relevant Law

Pennsylvania courts have long recognized that, "as to equity, . . . there is no rule perhaps better established than that the person who claims it must come into court for that purpose with clean hands." *McKee v. Gilchrist*, 3 Watts 230, 234 (Pa. 1834). "This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief . . . ." *Shapiro v. Shapiro*, 204 A.2d 266, 268 (Pa. 1964) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)). This equitable defense applies only where there is "willful misconduct [ ] concern[ing] the particular matter in litigation." *Id.* However, "in exercising [its] discretion, [a court] is free to refuse to apply the doctrine if a consideration of the entire record convinces [it] that an inequitable result will be reached." *Id. See also Stauffer v. Stauffer*, 351 A.2d 236, 245 (Pa. 1976) (noting that courts are "free not to apply the doctrine if a consideration of the entire record convinces [it] that an inequitable result will be reached by applying it" and affirming a lower court's decision not to enforce the doctrine).

12

3.    Analysis

We agree with the Secretary that the County's well-documented willful misconduct directly relating to this litigation would ordinarily call for application of the unclean hands doctrine. Indeed, the "County['s] deliberate[], willful[], and wrongful[] violat[ion] [of] th[e Supreme] Court's [Injunction Order] when it allowed Speckin to inspect the [V]oting [E]quipment" has been extensively documented and conclusively established in this litigation. *Fulton County II*, 292 A.3d at 1010. The County's conduct in violating the Injunction Order—directly related to and part of this litigation—was itself enough to show that the County had unclean hands. *Id.* However, we are mindful that, in certain circumstances, it is inappropriate for unclean hands to serve as a complete bar to recovery, and a court, sitting in equity, has broad discretion. *Shapiro*, 204 A.2d at 268.

When the Supreme Court in *Fulton County II* flagged the County's wrongful conduct, it also decided which sanctions were appropriate at that time. We recognize that it expressly declined to impose dismissal of the Amended Petition for Review as a sanction, being fully aware of the County's conduct. It explained:

> [T]he Special Master does not recommend that this Court grant the Secretary's requested sanction of directing dismissal of the County's underlying [Amended] Petition for Review.[] We agree. To grant that sanction would cross the line between a coercive and punitive sanction, which lies outside the bounds of a civil contempt proceeding. Moreover, notwithstanding the presence of potentially fact-dependent claims, the County's [Amended] Petition for Review includes pure questions of law pertaining to the Secretary's authority that may be resolved without recourse to the compromised evidence. Settling these legal questions will serve not only the parties **but the Commonwealth generally**. While we must hold the County to account for flouting our order, we will not deny its day in court on its **duly raised, purely legal claims** concerning the complex balance of state and local power over elections and the equipment used in election administration.

13

*Fulton County II*, 292 A.3d at 1012 (emphasis added) (footnote omitted).

Although the unclean hands issue was not squarely before the Supreme Court, we believe its reasoning—that the Commonwealth generally deserves answers to the pure questions of law raised in the petition for review—is instructive here. To the extent the legal issues raised by the Amended Petition for Review are of statewide importance and impact more than just the County, the Court concludes that applying the unclean hands doctrine would be less equitable than refusing to apply it. In sum, all voters and county boards of elections in the Commonwealth deserve an answer to the key legal questions in this case; the County's unlawful conduct in the course of this litigation does not preclude the answering of these questions.

### C. *Whether Counts I and II of the Amended Petition for Review are moot.*

We next confront an additional threshold question: Whether we should decline to address Counts I and II, because, the Secretary asserts, they are now moot.

#### 1. Arguments

The Secretary argues that Counts I and II of the Amended Petition for Review are moot for two reasons. First, he points to the County's representation that it no longer intends to use the Voting Equipment, citing the Supreme Court's recognition that the County "disclaim[s] any intention to use the [Voting E]quipment again." (Secretary's Appl. at 52 (quoting *Fulton County II*, 292 A.3d at 1011).) Therefore, the Secretary argues that whether the Secretary erred in decertifying the Voting Equipment—and whether this Court should reverse that determination—"no longer presents a live controversy and must therefore be dismissed." (*Id.* at 53.)

The Secretary's second reason that Counts I and II are moot relates to the fact that the County allowed the Speckin inspection, which it asserts "was even more intrusive than the Wake TSI [i]nspection—and even more secretive." (*Id.* at 53.) It

14

is the Secretary's theory that because Counts I and II relate to the condition following the Wake TSI inspection, and the ability of Fulton County to continue to use the Voting Equipment following **that** inspection, the subsequent Speckin inspection has mooted those counts because that question can no longer be answered. In other words, Secretary posits, "as a result of the Speckin [i]nspection, the practical controversy presented by Counts I and II," which specifically concerns the condition of the Voting Equipment post Wake TSI inspection, "is no longer a live one." (*Id.* at 55.)

The County does not respond to this argument.

### 2. Applicable Law

Pennsylvania courts are loath to decide abstract questions or to issue advisory opinions, *DeWeese v. Ridge*, 681 A.2d 852, 853 (Pa. Cmwlth. 1996), so it follows that "courts will not decide moot questions," *Public Defender's Office of Venango County v. Venango County Court of Common Pleas*, 893 A.2d 1275, 1279 (Pa. 2006). A case becomes moot when "changes in the facts or in the law [] . . . deprive the litigant of the necessary stake in the outcome." *Magnelli v. Pa. State Civ. Serv. Comm'n*, 423 A.2d 802, 804 (Pa. Cmwlth. 1980) (quoting *In re Gross*, 382 A.2d 116, 119 (Pa. 1978)). We have explained that "the critical inquiry in determining whether a case has become moot is whether the court's decision could, in substance, accord the injured party relief." *Toland v. Pa. Bd. of Prob. & Parole*, 311 A.3d 649, 658 (Pa. Cmwlth. 2024).

### 3. Analysis

We agree with the Secretary that Counts I and II of the Amended Petition for Review are moot. As discussed above, Count I seeks a declaration that the Secretary's decertification of Fulton County's Voting Equipment was "arbitrary,

15

capricious, and legally improper, and an error of law," such that the decertification "should be stricken and rendered null and void[.]" (Am. Pet. for Rev., Count I, Wherefore Clause.) Count II seeks a declaration that, with respect to the Voting Equipment, the County complied with the Election Code and Guidance in hiring Wake TSI to inspect the Voting Equipment and assist the County in analyzing that system, and that any finding to the contrary be struck, such that "decertification by the Secretary [is] null and void and of no effect[.]" (*Id.*, Count II, Wherefore Clause.) Both counts implicate the County's now-defunct, impounded Voting Equipment, and the Secretary's decertification of the same. The relief requested as to both counts is, in essence, reversal of the Secretary's decertification of the Voting Equipment, presumably reflecting the County's position, at the time of filing of the original Petition for Review, of an intent to use that equipment **in a future election**. But, as our Supreme Court recounted, "[t]he County insists, with increasing volume . . . , that it has **no interest in the [Voting E]quipment** it now identifies as 'defunct.'" *Fulton County II*, 292 A.3d at 1011 (emphasis added). Indeed, "it **disclaims any intention** to use the [Voting E]quipment again." *Id.* (emphasis added). Because Fulton County will not use the Voting Equipment again—indeed, it is out of Fulton County's possession, and will remain so—reversal of the Secretary's decertification of the same would have no effect, and so the County no longer has a stake in the outcome of Counts I and II. That requested relief is now moot. Accordingly, Counts I and II of the Amended Petition for Review are dismissed as moot.

D. *Whether the Secretary's issuance of Directive 1 is consistent with the Election Code.*

1. Arguments

According to the Secretary, he had the authority to issue Directive 1 pursuant to Section 1105-A, which requires counties to comply with the requirements for the use of an EVS set forth in the Secretary's certification report. Specifically, the Secretary explains that the relevant certification report here "requires counties to, *inter alia*, physically secure the components of the [EVS], prevent potentially compromising access to those components, and ensure the components remain in a certified state." (Secretary's Appl. at 72-73.) He argues further that Section 1105-A(a) expressly permits the issuance of "'directives or instructions,' like Directive 1." (*Id.* at 73 (quoting 25 P.S. § 3031.5(a)).) In the Secretary's view,

> Directive 1 properly clarifies that counties' obligation to protect the physical integrity and chain of custody of state-certified [EVSs]—as set forth in the Election Code and the Secretary's use-conditions of certification—prohibits counties from permitting the kind of intrusive third-party access exemplified by the Wake TSI [i]nspection, *i.e.*, from permitting third parties not involved in the conduct of elections to access the machines, image hard drives, and copy sensitive data. Before the November 2020 election, the Department . . . believed that this proposition was too obvious to need stating. Just as no county would be so reckless as to try to install its own software on state-certified [EVSs], or leave them out unsheltered in the rain, no county would, the Department believed, turn its state-certified [EVSs] over for wholesale imaging by independent third parties. But in the aftermath of the November 2020 election, it became clear that one county had done exactly that—and that several other counties had been asked to do the same. Accordingly, the Secretary issued Directive 1 to make clear that such access would violate the use-conditions of certification, making it impossible to assure that the affected components remained in a certified state. It was entirely lawful and appropriate—and, from an election security standpoint, necessary—for the Secretary to do this.

(Secretary's Appl. at 73-74.)

17

Further, the Secretary asserts that language in *Fulton County I* suggesting that Directive 1 may be infirm because it was not promulgated in accordance with the statute commonly referred to as the Commonwealth Documents Law (CDL)[9] is not dispositive of this matter. The Secretary first observes "decisions on preliminary objections are not law of the case with respect to motions seeking judgment at a later stage of the proceedings." (*Id.* at 74-75.) Additionally, the Secretary argues, *Fulton County I* did not reflect a final resolution on the issue of Directive 1's legal propriety, but simply the conclusion that it could not be said "with certainty at th[at] juncture that Count III [of the Amended Petition for Review] d[id] not state a claim." (*Id.* at 75 (quoting *Fulton County I*, 276 A.3d at 861) (alterations by the Secretary).) The Secretary argues that, importantly, *Fulton County I* did not analyze the language of Section 1105-A(b), upon which the Secretary relies as support for summary relief. (*Id.* at 75-76.) Finally, Directive 1, says the Secretary, is not a regulation because it is not applicable to the public at large, but only on county boards of elections which are statutorily obligated to comply with the conditions imposed by the Secretary for the use of EVSs. (*Id.* at 76.) The Secretary also argues that it would not be administrable to require the Secretary to go through a cumbersome rulemaking process each time it had to issue a directive to a county board of elections.

The Secretary also asserts that Directive 1 is consistent with earlier guidance issued in 2016 and updated in 2020.[10] That is because while the earlier guidance contemplated the use of vendors only for "election preparation tasks," Directive 1 is geared toward "third[-]party entities **not** directly involved with the conduct of

---

[9] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102-1208, 1602, and 45 Pa.C.S. §§ 501-907. "Commonwealth Documents Law" was the official short title of the 1968 enactment. *See* Section 101 of the Act of July 31, 1968, P.L. 769, *formerly* 45 P.S. § 1101, repealed by Section 7 of the Act of July 9, 1976, P.L. 877.

[10] That guidance is attached to the Amended Petition for Review at Exhibits C and D.

elections." (*Id.* at 78 (emphasis in original).) The Secretary explains that there is a major difference between engagement of election preparation vendors, which are usually manufacturers, and the vendors which would intrusively inspect voting equipment following an election. According to the Secretary, the Election Code requires counties to prepare EVSs for elections but says nothing about post-election inspections.

For its part, the County begins with the Elections Clause of the United States Constitution, which provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof . . . ." U.S. CONST. art. I, § 4, cl. 1. According to the County, "[t]here is no ambiguity or diffusion of delegated authority in the [E]lection [C]ode concerning exclusive authority over electronic voting machines and their deployment and use in elections." (County's Appl. at 10.) The County argues the Elections Clause is dispositive here.

Turning to its statutory argument, the County posits that Section 1105-A only empowers the Secretary to issue directives, not regulations, and only with respect to examination and reexamination of EVSs. Subsection (a) is only about, according to the County, "the procedures by which a **vendor** may seek approval of" an EVS. (County's Appl. at 12; *see also id.* at 14.) It points to the *Fulton County I* opinion, which analogized the directives permitted by subsection (a) to the government procurement context in which an agency sets forth the directives regarding how to submit a request for proposal. The County also argues the silence of Section 1105-A with respect to "certification" and "decertification" of individual voting devices suggests that the Secretary may not do so. (*Id.* at 13.) Further, the County argues it does not allow for approval or disapproval of any voting device. According to the

19

County, Section 1105-A only permits the Secretary to issue reports, not directives, to guide county boards of elections in procuring sufficient voting systems.

The County emphasizes the relationship between Section 302 and Section 1105-A, noting that Section 302 is "express, explicit, [and] absolute, and provides no room for ambiguity or vagueness." (*Id.* at 15.) We must, according to the County, read the two *in pari materia*. The County argues the mandatory language of Section 302—evidenced by the use of the term "shall perform"—stands in contrast to Section 1105-A(a)'s language of "may issue." (*Id.* at 16.) In other words, the County argues that the Secretary has displaced the County's statutory obligations under Section 302 by purporting to promulgate Directive 1.

With respect to any suggestion that the Secretary's interpretation is entitled to deference, the County asserts that the Secretary's position has flip-flopped from its 2016 and 2020 guidance, such that the Secretary is not entitled to "very much deference." (*Id.* at 17 (quoting *The Dauphin Cnty. Indus. Dev. Auth. v. Pa. Pub. Util. Comm'n*, 123 A.3d 1124, 1135 (Pa. Cmwlth. 2015)).) Instead, the County argues, the Court should give deference to its interpretation because "by the federal constitution's delegation under the Elections Clause, and via the General Assembly's re-delegation[,] **the government agency** charged with its enforcement – of time, manner and place," are the county boards of elections. (*Id.* (emphasis added) (internal quotation marks omitted).) The County cites several other provisions of the Election Code for further support that it, and not the Secretary, is empowered to handle election equipment. Section 302(c), for example, provides that Fulton County must "purchase, preserve, store[,] and maintain[] primary and election equipment of all kinds . . . ." (*Id.* at 18 (quoting 25 P.S. § 2642(c)).)

20

The County returns to the Elections Clause, noting that the General Assembly delegated express powers to the counties, not to the Secretary.

> To allow "implicit" delegation to trump express delegation would run counter to the principles of constitutional law and federalism embodied in the United States Constitution. If the Pennsylvania Legislature were to delegate exclusive authority and control over [EVSs] to the Secretary . . . , something it has not done, and something that [the County] would not concede it could ever do under the principles of federal delegation of "time, manner, place," then perhaps the Secretary's arguments would support statutory authority.

(*Id.*) The County, citing to Chief Justice Roberts's dissent in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787, 841 (2015), notes that the legislature "may not be cut out of th[e] process" of prescribing regulations vis-à-vis elections by "administrative or bureaucratic functionaries." (*Id.*) The County asserts that, "of course," the Elections Clause applies to the authority provided to counties to "manage, examine, contract for, and inspect the electronic systems used for voting in national elections." (*Id.* at 22.) It reasons that the Wake TSI inspection was expressly permitted and delegated by the General Assembly to the County, and the Secretary cannot deprive it of that power. Finally, the County asserts that the Secretary cannot decertify individual components of EVSs, but rather must decertify the entire system across the Commonwealth under Section 1105-A(a) and (c).

In short, the County argues that the County had an independent duty and obligation to inspect, maintain, and investigate the Voting Equipment "in consideration of its relationship with Dominion," and that Directive 1 deprived it, and other counties, of their authority to perform these actions, as well as their ability to regulate who may inspect election equipment. (County's Appl. at 22-24.) Section

21

1105-A(a) does not confer this authority upon the Secretary because that section only allows the Secretary to examine systems prior to certification and possibly provide directives as to implementation to the counties. "Nowhere in that provision is 'Time, Place, and Manner' of the actual conduct[] of elections delegated to the Secretary." (*Id.* at 23.) Further, Section 1105-A(c), according to the County, would have required the Secretary to decertify the entire system across the Commonwealth. They conclude that Pennsylvania county boards of elections "have been constitutionally delegated . . . with exclusive authority over all matters concerning voting, voting machines, and [EVSs]." (*Id.* at 26.)

The Secretary filed an Answer, observing that, in claiming that the County has the "exclusive authority over all matters concerning voting, voting machines, and [EVSs,]" the County has taken an extreme position that raises election security concerns. (The Secretary's Answer at 2-3.) According to the Secretary, the Elections Clause does not support the County's claims, as nothing therein restricts the grant of regulatory election-related authority to the Secretary, and nothing in the Election Code grants county boards of elections the "exclusive authority" the County claims. (*Id.* at 4, 7-8.) This position, the Secretary argues, is contrary to the Supreme Court's recognition of the Secretary as the chief election official, who has "broad discretionary authority to determine whether and in what circumstances [EVSs] are safe to use," which includes that granted under Section 1105-A. (*Id.* at 4, 8-11, 13 (citing, e.g., *Banfield v. Cortes*, 110 A.3d 155 (Pa. 2015)).) According to the Secretary, Section 1105-A authorizes him to certify EVSs as safe and secure and to impose conditions on those systems to keep them that way. The Election Code, the Secretary argues, also requires county boards of elections to comply with the conditions imposed by the Secretary and, absent that compliance, the conditioned

22

certification cannot be maintained because the systems' security cannot be ensured. (*Id.* at 13-14.) The implementation of EVSs, the Secretary asserts, was done with the understanding that the use of such technically sophisticated systems "required the application of technical expertise," and their use in Pennsylvania required certification that the systems provide adequate security measures as determined by the Secretary's discretionary judgment. (*Id.* at 17-19 (citing *Banfield*, 110 A.3d at 174).)

The Secretary further asserts the County "grossly overread[s]" Section 302 and the County's "general authority to conduct a[n] . . . inspection of the elections," as such authority must necessarily be subject to the Secretary's conditions on the use of those systems so as to prevent the jeopardization of the election infrastructure. (*Id.* at 22.) The certification report associated with the EVS here, the Secretary argues, addressed maintaining the physical security of the system and clearly requires that any county using the system comply with the report's conditions and any directive regarding that system issued by the Secretary, which includes Directive 1. (*Id.* at 22-23.) According to the Secretary, if components of an EVS are compromised, those components cannot be considered part of the certified system and they cannot be used by a county as part of a certified system. Accepting the County's position, the Secretary maintains, would mean that every county board of elections can do whatever it wants with its EVSs under the premise that such actions relate to "inspecting elections," an absurd and unreasonable result. (*Id.* at 24-25.) In contrast, the Secretary asserts his interpretations of Sections 302 and 1105-A authorize him to preclude the intrusive inspection of EVSs by an unauthorized third party and comports with the General Assembly's intent under the rules of statutory construction.

23

## 2. Applicable Law

Because this case requires us to resolve questions of statutory interpretation, we first review those familiar principles.

> "The polestar of statutory construction is to determine the intent of the General Assembly." *Hannaberry HVAC v. Workers' Comp. Appeal Bd. (Snyder, Jr.)*, . . . 834 A.2d 524, 531 ([Pa.] 2003) (citing Section 1921(a) of the Statutory Construction Act [of 1972 (Statutory Construction Act)], 1 Pa.C.S. § 1921(a)). The words the General Assembly chose, when "clear and free from all ambiguity . . . are presumed to be the best indication of legislative intent." *Id.* (citation omitted). We may only consult administrative interpretations of a statute when a statute is ambiguous. 1 Pa.C.S. § 1921(c). We consider a statute ambiguous where its text gives rise to "at least two reasonable interpretations." *Warrantech Consumer Prods. Servs., Inc. v. Reliance Ins. Co. in Liquidation*, . . . 96 A.3d 346, 354-55 ([Pa.] 2014).

*700 Pharmacy v. Bureau of Workers' Comp. Fee Rev. Hearing Off. (State Workers' Ins. Fund)*, 315 A.3d 914, 924 (Pa. Cmwlth. 2024). The Statutory Construction Act also requires us, if possible, to construe statutes, or parts of statutes, *in pari materia* together as one statute. Section 1932(b) of the Statutory Construction Act, 1 Pa.C.S. § 1932(b). "Statutes . . . are in pari materia when they relate to the same persons or things or to the same class of persons or things." 1 Pa.C.S. § 1932(a). This rule of construction only serves "as an aid to construction when resolving statutory ambiguities." *DeForte v. Borough of Worthington*, 212 A.3d 1018, 1022 (Pa. 2019).

## 3. Analysis

### a. Elections Clause

The County maintains it is entitled to summary relief because it has proceeded in the manner delegated to it by the United States Constitution. The Elections Clause of the United States Constitution provides that "[t]he Times, Places and Manner of

holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof . . . ."  U.S. CONST. art. I, § 4, cl. 1.  The United States Supreme Court has stated that, in the context of the Elections Clause, "States retain autonomy to establish their own governmental processes." *Arizona State Leg.*, 576 U.S. at 816 (holding that state constitutional amendment providing for independent redistricting commission did not run afoul of the Elections Clause).[11] *See also Moore v. Harper*, 600 U.S. 1, 25-27 (2023) (reaffirming the notion that state legislatures do not retain unbridled authority under the Elections Clause; rather, they remain subject to the constraints of state constitutions as interpreted by state supreme courts).

First, as a threshold matter, it is, of course, true that our General Assembly is vested with the power, under the Elections Clause, to regulate the time, place, and manner of the election of Senators and Representatives.  Indeed,

> [b]y fulfilling their constitutional duty to craft the rules governing federal elections, state legislatures do not consent, ratify, or elect—they **make laws**.  Elections are complex affairs, demanding rules that dictate everything from the date on which voters will go to the polls to the dimensions and font of individual ballots.  Legislatures must "provide a complete code for congressional elections," including regulations "relati[ng] to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns."

---

[11] The *Arizona State Legislature* Court described "[t]he dominant purpose of the Elections Clause" as

to empower Congress to override state election rules, not to restrict the way States enact legislation.  As this Court explained in *Arizona v. [The] Inter Tribal Council of Ariz[ona], Inc.,* 570 U.S. [1] . . . (2013), the Clause "was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." *Id.*[] at [8] . . . (citing The Federalist No. 59, pp. 362-[]63 (C. Rossiter ed. 1961) (A. Hamilton)).

*Arizona State Leg.*, 576 U.S. at 814-15.

*Moore*, 600 U.S. at 29 (second alteration in original) (emphasis added) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)).

However, this case concerns statutory provisions that, consistent with the Elections Clause, the **General Assembly has enacted** as part of the "complete code," *id.*, to regulate elections, congressional elections in particular, and elections generally. As part of that "code," the General Assembly has given some election administration responsibilities to the Secretary, and others to counties, as is within its authority. *See Arizona State Leg.*, 576 U.S. at 816 (providing that "States retain autonomy to establish their own governmental processes"); *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1328 (N.D. Ga.) (stating that state legislatures "possess the authority to delegate their authority over elections to state officials in conformity with the Elections . . . Clause[]"), *aff'd*, 981 F.3d 1307 (11th Cir. 2020); *Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) ("The Elections Clause . . . affirmatively grants rights to state legislatures, and under Supreme Court precedent, to other entities to which a state may, consistent with the Constitution, delegate lawmaking authority."). To accept the County's Elections Clause argument, we would have to conclude that the Elections Clause somehow "restrict[s] the Legislature to vesting authority over elections in" some entities, but not others, (Secretary's Answer at 8), but it does not, *Arizona State Leg.*, 576 U.S. at 816; *Wood*, 501 F. Supp. 3d at 1328; *Corman*, 287 F. Supp. 3d at 573. Thus, the resolution of this case involves the interplay between Section 1105-A and Section 302 in which the General Assembly has delegated its authority relating to the regulation of elections.

### b. *Section 1105-A*

We now turn to the crux of the present dispute—whether the Secretary acted within his authority in issuing Directive 1. The Secretary argues that this authority is derived from Section 1105-A, which sets forth the Secretary's powers and duties regarding EVSs. After review of the relevant provisions of the Election Code, we conclude the Secretary acted within his authority.

Section 1105-A became part of the Election Code in 1980, when the General Assembly added Article XI-A, which first provided for EVSs.[12] An EVS is "a system in which **one or more voting devices** are used to permit the registering or recording of votes and in which such votes are computed and tabulated by automatic tabulating equipment. . . ." Section 1101-A of the Election Code, 25 P.S. § 3031.1[13] (emphasis added). A voting device includes "an apparatus by which such votes are registered electronically, so that . . . the votes so registered may be computed and tabulated by means of automatic tabulating equipment." *Id.*

Section 1105-A was amended to its current form in 2002,[14] in response to changes in federal law. As our Supreme Court has explained:

> In October 2002, Congress enacted the Help America Vote Act ([]HAVA,[)] . . . [(]52 U.S.C. §[§] 20901[-21145,]) to reform the nation's voting process in response to the issues that arose in the 2000 presidential election. *See generally Bush v. Gore*, 531 U.S. 98 . . . (2000). One of HAVA's main purposes was to authorize funding for the replacement of lever and punch card voting machines with other systems that are HAVA compliant.[] Although the Secretary urged counties to obtain [EVSs], each county retained discretion on whether to replace their voting systems, provided that the chosen system met federal and state requirements. . . . One such requirement in the Election Code is that an [EVS] must be subject to a certification process before it is deemed authorized for use in an election. The **Secretary** has the **duty "[t]o** examine **and reexamine** voting machines, and to approve or disapprove them for use in this state, in accordance with the provisions of

---

[12] Section 4 of the Act of July 11, 1980, P.L. 600.

[13] Section 1101-A was added by Section 4 of the Act of July 11, 1980, P.L. 600.

[14] Section 9 of the Act of December 9, 2002, P.L. 1246.

27

[the Election Code]." [Section 201(b) of the Election Code,] 25 P.S. § 2621(b). A county board of elections may choose among the certified [EVSs] and independently procure such system for use in its districts. [Section 1104-A of the Election Code, added by Section 4 of the Act of July 11, 1980, P.L. 600,] 25 P.S. § 3031.4. The board of elections then appoints custodians to prepare the voting system for use. [Section 1110-A of the Election Code, added by Section 4 of the Act of July 11, 1980, P.L. 600,] 25 P.S. § 3031.10.

*Banfield*, 110 A.3d at 160 (footnote omitted) (emphasis added).

Section 1105-A(a) begins by providing a mechanism for those "owning, manufacturing or selling, or being interested in the manufacture or sale of, any [EVS]" to "request the Secretary . . . to examine such [EVS,]" provided it "has been examined and approved by a federally recognized independent testing authority" and otherwise complies with federal standards. 25 P.S. § 3031.5(a). Subsection (a) also provides for reexamination of EVSs. Not only can 10 qualified registered electors request reexamination of an EVS from the Secretary, but the Secretary may also, "in his discretion, reexamine any [] [EVS] therefore examined and approved by him" at any time. *Id.* Finally, and most relevant here, subsection (a) states that "[t]he **Secretary** . . . may issue **directives or instructions** for implementation of electronic voting procedures and **for the operation of [EVSs]**." *Id.* (emphasis added).

Subsection (b) directs that after a request for an examination or reexamination of an EVS or the Secretary determines that an EVS should be reexamined, "the **Secretary** . . . shall examine the [EVS] and shall make and file in his office his report . . . stating whether, in his opinion, **the system so examined can be safely used by voters at elections** as provided in this act and meets all of the requirements hereinafter set forth." 25 P.S. § 3031.5(b) (emphasis added). Further, subsection (b) directs that "[t]he **county board shall comply with the requirements** for the use of the [EVS] as set forth **in the report by the Secretary**. . . . " *Id.* (emphasis added).

28

Subsection (c) provides that if a previously approved EVS is reexamined, and the **Secretary** concludes that the "system so reexamined **can no longer be used safely by voters at elections** as provided in this act **or does not meet the requirements hereinafter set forth**, **the approval** of that system **shall** forthwith **be revoked** by the **Secretary** . . . , and that system shall not thereafter be used or purchased for use in this Commonwealth." 25 P.S. § 3031.5(c) (emphasis added).

It is true, as the County points out, that the first two sentences of Section 1105-A(a) address persons or corporations wishing to manufacture or sell an EVS in the Commonwealth and contemplates a process by which they may request examination from the Secretary, provided the EVS in question complies with federal standards. 25 P.S. § 3031.5(a). But Section 1105-A(a) does not restrict itself to that subject matter. Indeed, the next sentence shifts to another scenario and set of stakeholders, providing that 10 or more qualified registered electors may petition for reexamination to the Secretary of an EVS so long as they pay the requisite fee. *Id.* But most strikingly, the penultimate sentence confers broad authority and discretion upon the Secretary: "The **Secretary** . . . may, **at any time**, **in his discretion**, **reexamine any** such **system** therefore examined and approved by him." *Id.* (emphasis added). And, by definition, "such system[s]," *id.*, consist of the voting devices that electronically register votes so that they "may be computed and tabulated by means of automatic tabulating equipment." 25 P.S. § 3031.1.

The structure and progression of Section 1105-A(a) to this point is logical. It begins with vendors, which certainly have an interest in the examination and approval of EVSs, proceeding next to addressing qualified registered electors, who also certainly have such an interest. But Section 1105-A(a) also provides that the Secretary, "Pennsylvania's chief election official[,]" *Banfield*, 110 A.3d at 174, has

29

an ongoing interest in ensuring that an EVS can "be used safely by voters at elections as provided in this act" and will continue to "meet the requirements hereinafter set forth" in the Election Code, 25 P.S. § 3031.5(c). Reflective of this interest, the legislature granted the Secretary the authority to independently reexamine an EVS he had previously approved and revoke that approval if the Secretary concludes it does not meet those standards.

Against that backdrop, Section 1105-A(a)'s final sentence provides expansively that "[t]he Secretary . . . may issue **directives or instructions** for **implementation** of electronic voting procedures and for the **operation of** [**EVSs**]." 25 P.S. § 3031.5(a) (emphasis added). When read with the other provisions of Section 1105-A, particularly subsection (c), the "operation of [EVSs]" in this final sentence necessarily means instructions on the operation of the EVSs in a manner that is safe and meets the requirements of the Election Code. The requirements of EVSs are set forth in Section 1107-A of the Election Code, 25 P.S. § 3031.7.[15] While some of these requirements relate to how voters interact with the EVSs to select the candidate of their choice, many others relate to the security and safety of those systems and the need to ensure secrecy of the ballots. For example, Section 1107-A(1) requires that an EVS "[p]rovide[] for voting in absolute secrecy and prevent[] any person from seeing or knowing for whom any voter, except one who has received or is receiving assistance as prescribed by law, has voted or is voting." 25 P.S. § 3031.7(1). Section 1107-A(12) mandates that an EVS "provide[] acceptable ballot security procedures and impoundment of ballots to prevent tampering with or substitution of any ballots or ballot cards." 25 P.S. § 3031.7(12). Still other subsections require that EVSs prevent voters from voting more than they

---

[15] Added by Section 4 of the Act of July 11, 1980, P.L. 600.

are entitled, reflect accurate votes, provide verification mechanisms, and prevent tampering to the systems. *See* 25 P.S. § 3031.7(7), (8), (11), (13), (16), (17). Thus, the Secretary has the authority to issue directives or instructions regarding the operation of approved EVSs to ensure that these statutory requirements **continue to be met** and the EVSs may **continue to be operated safely**.

Additionally, consistent with the Section 1107-A's requirements that EVSs remain secure and accurate, and that actions should be taken to prevent tampering of the EVSs, Section 1121-A(a) of the Election Code directs county boards of elections to appoint a custodian of those systems, their components, and the keys thereto. 25 P.S. § 3031.21(a).[16] County boards of elections are likewise required to provide "safe storage and care of the system and placement of its keys in a security vault." *Id.* These provisions reflect a legislative intent of limiting access to EVSs, which aids in ensuring that the systems can be operated in a manner that is safe, secure, and consistent with the requirements of the Election Code.

"[S]tatutory language is to be interpreted in context, with every statutory section read together and in conjunction with the remaining statutory language[] and construed with reference to the entire statute as a whole." *Tr. Under Agreement of Taylor*, 164 A.3d 1147, 1157 (Pa. 2017) (internal quotation marks and citations omitted). When Section 1105-A is construed in context of these other provisions, the Secretary had the authority to issue Directive 1 under Section 1105-A as it provided "instructions for the implementation of electronic voting procedures and for the operation of [EVSs]," 25 P.S. § 3031.5(a), in a manner that is safe and complies with the requirements of the Election Code. Specifically, Directive 1 directs county boards of elections not to "provide physical, electronic, or internal

---

[16] Added by Section 4 of the Act of July 11, 1980, P.L. 600.

31

access to third parties" desiring to "copy and/or conduct an examination of state-certified [EVSs], or any components of such systems." (Petition for Review, Ex. F., ¶ 3a.) This is a directive or instruction on how an EVS is to be operated in order for it to remain safe for voters to use in future elections and to continue to meet the requirements of the Election Code for such systems, particularly those related to the secrecy of ballots and security of the system and its components. Thus, Directive 1 was authorized by Section 1105-A(a) of the Election Code's delegation of authority to the Secretary to issue directives and instructions relating to the operation of EVSs.

Section 1105-A(b) reinforces that conclusion. It first provides that when the Secretary receives a request for examination or reexamination of an EVS or determines that an EVS should be reexamined, he "shall examine" it, and "make and file in his office his **report** . . . stating whether, in his opinion, the system so examined can be safely used by voters at elections as provided in this act and meets all of the requirements hereinafter set forth." 25 P.S. § 3031.5(b) (emphasis added). It continues by addressing various specifications and considerations the Secretary must also include in his report, if the Secretary concludes, upon examination or reexamination, that the EVS can be used safely and in accordance with the Election Code's requirements. But it concludes by emphasizing that county boards of elections "**shall comply** with the requirements for the use of the [EVS] **as set forth in the report** by the Secretary . . . ." *Id.* (emphasis added).

Here, the relevant report issued by the Secretary when the EVS was approved set forth the various examinations performed before it was approved for use in Pennsylvania, including testing to ensure it met the secrecy and security requirements of Section 1107-A. (Am. Pet. for Rev., Ex. A, at 8-13, 19-20, 27-29, 34-39.) Included in that analysis was an examination of the equipment to confirm

32

that the "[d]evices are not accessible to unauthorized personnel to programmatically tamper with the device that would affect ballot presentation, print, or any other feature/activity" or to "affect ballot processing, delivery to ballot box, or any other feature/activity . . . ." (*Id.* at 27-28.) Based on the results of these numerous examinations, the report requires, as conditions for the certification, that the EVS is safe and complies the Election Code, and specific actions by county boards of elections that choose to use that particular equipment for their elections. (*Id.* at 40.)

One such action required is for county boards of elections to "implement administrative safeguards and **proper chain of custody to facilitate the safety and security of [EVSs.]**" (*Id.* at 42 (emphasis added).) It continues that county boards of elections "using the services of Dominion or a third-party vendor for election preparation activities **must work** with Dominion or the vendor to ensure that systems . . . use **certified voting system components**" and must ensure that any data transfer between the vendor and county be tracked and audited to ensure that "data has not been accessed by unauthorized personnel." (*Id.* at 44 (emphasis added).) The report similarly requires a county board of elections to implement processes and procedures to manage, monitor, and verify the "seals, locks/keys, before, during and after the election," and maintain a "strict chain of custody" of, among other items, "USB devices and any removable or transportable media used for election activities." (*Id.* at 44, 47.) The report further provides that the EVS "must be physically secured while in transit, storage, or while in use . . ." and that "[u]nmonitored physical access to devices can lead to compromise, tampering, and/or planned attacks." (*Id.* at 46.) The report also explicitly states that county boards of elections "must comply with the conditions found in this report, **and any directives issued** by the Secretary [] regarding use of this [EVS]," citing Section

1105-A(a) and (b) of the Election Code. (*Id.* at 50.) The report concludes that the EVS tested "can be safely used by voters at elections . . . and meets all of the requirements set forth in the [Election] Code, **provided the [EVS] is implemented with the conditions listed in Section IV of this report**." (*Id.* at 52 (emphasis in original).) Thus, pursuant to Section 1105-A(b)'s requirement that county boards of elections "shall comply" with that report, which in turn mandates compliance with an existing directive on the use, implementation, and operation of EVSs issued by the Secretary, and future revisions or directives, the Secretary issued Directive 1, clarifying the procedures for securing the EVS, what the proper chain of custody of the EVS is, including any USB device or removable or transferable media used in election activities, entails, and preventing unauthorized access conditions. Stepping back, then, we hold that subsections 1105-A(a) and (b), read together and along with subsection (c) and Sections 1107-A and 1121-A, authorize the Secretary to issue the kind of directive issued here and to expect compliance therewith.

At bottom, the General Assembly gave the Secretary, Pennsylvania's chief elections official, unique authority to approve EVSs that are safe and meet the statutory requirements for use in the Commonwealth, if they are used in accordance with the reports issued by the Secretary in association with an EVS's approval, which are binding on the county board of elections that choose to use that EVS. The General Assembly also authorized the Secretary to issue binding directives and instructions relating to the implementation of electronic voting procedures and the operation of the approved EVSs, which, when read in context of other provisions in Section 1105-A and elsewhere in the Election Code, encompasses the operation of the EVSs in a manner that is safe and compliant with the Election Code's requirements for such systems. The General Assembly finally gave the Secretary

34

authority to reexamine already approved EVSs, which by definition includes the voting devices themselves, to ascertain if such systems can **continue to be used** in a manner that is safe and in accordance with the Election Code and, if not, to decertify the same. The County's arguments that county boards of elections can disregard that authority and unilaterally take actions that could render an EVS unsafe for use in an election and/or non-compliant with the Election Code, thereby potentially compromising election security, would render Section 1105-A meaningless. Ultimately, such arguments defeat the purpose that Section 1105-A's plain text bespeaks: to make sure that EVSs are implemented safely and in accordance with the Election Code's requirements statewide, which is accomplished through the Secretary issuing reports, directives, and instructions to ensure such implementation and compliance. For these reasons, the Secretary was within his authority under Section 1105-A to issue Directive 1.

Further, we reject arguments, predicated on *Fulton County I*, that the Secretary exceeded his authority because to issue "directives or instructions" requires compliance with the Regulatory Review Act (RRA)[17] and CDL. It is a well-worn principle of statutory construction that "although 'one is admonished to listen attentively to what a statute says[; o]ne must also listen attentively to what it does not say.'" *Kmonk-Sullivan v. State Farm Mut. Auto. Ins. Co.*, 788 A.2d 955, 962 (Pa. 2001) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 536 (1947)). Here, the General Assembly could have required the Secretary to promulgate binding regulations consistent with the RRA and CDL. Indeed, in many other contexts, the General Assembly, when it intends for agencies to promulgate regulations under the CDL and RRA, has been clear by

---

[17] Act of June 25, 1982, P.L. 633, *as amended*, 71 P.S. §§ 745.1-745.14.

using terms of art found in the RRA, for example. *See, e.g.*, Section 4551(a) of the Vehicle Code, 75 Pa.C.S. § 4551(a) ("**Regulations** shall be **promulgated** . . . governing the safe design, construction, equipment and operation of vehicles engaged in the transportation of school children.") (emphasis added). *See* Section 3 of the RRA, 71 P.S. § 745.3 (defining "[p]romulgate" as "[t]o publish an order adopting a final-form or final-omitted regulation in accordance with . . . the [CDL]"). We also agree with the Secretary that given that the General Assembly already required the county boards of elections to comply with the conditions for use set forth in an EVS's report, 25 P.S. § 3031.5(b), it follows that they must comply with the directives and instructions issued by the Secretary that clarify and/or reiterate those conditions.

We also agree with the Secretary that the prohibition in Directive 1 on future use of voting equipment rendered decertified as a result of unauthorized third-party access is valid. The Secretary does not argue that Section 1105-A(c) is the textual hook for this authority. Rather, it follows that if an EVS has been treated in direct contravention to the report issued by the Secretary, it is no longer in a certified state. Accordingly, consistent with our analysis above—that the county boards of elections must comply with the report, the Secretary, through Directive 1, reminded county boards of elections that they may not use EVSs in a decertified state.[18]

---

[18] What is more, Section 1105-A(c) empowers the Secretary to decertify systems statewide when, upon reexamination, he concludes that they are no longer safe. 25 P.S. § 3031.5(c). If the Secretary has the authority to do that, we believe it follows that the greater power includes the lesser, particularly where the definition of EVS indicates that the systems consist of **one or more voting devices,** 25 P.S. § 3031.1. In other words, if the Secretary may decertify a system statewide, he may also decertify specific equipment when he knows that his report—with which counties must comply—has been violated. This is consistent with Section 1103-B(a) of the Election Code, added by Section 3.1 of the Act of October 31, 1999, P.L. 552, 25 P.S. § 3035.3(a), which specifically references the Department "decertif[ying] one or more voting apparatuses that are used **(Footnote continued on next page…)**

36

### c.	Section 302

The County maintains that Section 302 provides county boards of elections the exclusive authority to approve such inspections and, therefore, requires summary relief to be granted in its favor.  However, Section 302 does not require a different result.

Section 302 addresses the authority of county boards of elections and begins by providing that "county boards of elections . . . shall exercise, in the manner provided by [the Election Code], all powers granted to them . . . , and shall perform all the duties imposed upon them," after which it enumerates several powers and duties.  25 P.S. § 2642.  The County cites the following powers and duties of county boards of elections enumerated in Section 302 in support of its position:

> (c) To purchase, preserve, store and maintain primary and election equipment of all kinds, including voting booths, ballot boxes and voting machines, and to procure ballots and all other supplies for elections.
>
> (d) To appoint their own employes, voting machine custodians, and machine inspectors.
>
> . . . .
>
> (f) To make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors.
>
> (g) To instruct election officers in their duties, calling them together in meeting whenever deemed advisable, and to **inspect systematically and thoroughly the conduct of primaries and elections** in the several election districts of the county to the end that primaries and elections may be **honestly, efficiently, and uniformly conducted**.
>
> . . . .

---

in any county of this Commonwealth."  A "voting apparatus" is "[a] kind or type of [EVS] that received the approval of the Secretary . . . under [S]ection 1105-A."  Section 1101-B of the Election Code, added by Section 3.1 of the Act of October 31, 1999, P.L. 552, 25 P.S. § 3035.1.

(i) To investigate election frauds, irregularities and violations of [the Election Code], and to report all suspicious circumstances to the district attorney.

25 P.S. § 2642(c)-(d), (f)-(g), (i) (emphasis added). The language of these provisions has remained unchanged since the Election Code was promulgated in 1937.[19]

Section 302 does place important responsibilities on county boards of elections to make sure elections are fair and run smoothly within their jurisdictions. However, none of Section 302's powers and duties interfere or conflict with the Secretary's Section 1105-A's prerogatives; the two can coexist in harmony. We address each of the provisions of Section 302 upon which the County relies *seriatim*.

First, Section 302(c) obligates county boards of elections "[t]o purchase, preserve, store and maintain primary and election equipment of all kinds, including . . . voting machines[.]" 25 P.S. § 2642(c). We believe this is harmonious with Section 1105-A. Indeed, a county would violate its duty to **preserve** voting equipment if it allowed third-party access that violated the statutorily required report filed by the Secretary, and any directives clarifying the requirements of the report by which a county is bound pursuant to Section 1105-A(b), and left the equipment incapable of being safely and securely used in an election. Counties are free to maintain their election equipment in appropriate, lawful ways so that it remains secure and in **certified** condition.

Section 302(d) provides that county boards of elections may "appoint their own employes, voting machine custodians, and machine inspectors." 25 P.S. § 2642(d). To the extent the County endeavors to classify such an inspector as a "voting machine custodian" or "machine inspector," those terms are either

_____

[19] At argument, counsel for the County represented that Section 302 was amended as recently as 2022. However, the 2022 amendment made only slight changes to subsection (m), not relevant here. Section 2 of the Act of July 11, 2022, P.L. 1577.

specifically defined and/or their qualifications are set forth in the Election Code in a manner that does not support the County's argument that its actions here comported with the authority granted in Section 302. First, "[c]ustodian shall mean the person charged with the duty of **testing and preparing** voting devices and automatic tabulating equipment **for elections** and instructing election officials in the use of such voting devices and equipment." 25 P.S. § 3031.1 (emphasis added) (internal quotation marks omitted). However, as discussed above, the Secretary's report for the EVS at issue in this case required the County to work with Dominion to hire third-party vendors, which did not occur here. According to Section 1110-A(c), the custodian must also "take the constitutional oath of office, which shall be filed with the county board of elections." 25 P.S. § 3031.10(c).

Second, machine inspectors are polling place workers who serve for a given primary or election. Section 404 of the Election Code, 25 P.S. § 2674.[20] They are appointed "in each district in which more than one voting machine is used" and must be a "qualified registered elector of the county." *Id.* Machine inspectors must also

---

[20] Section 404 provides, in relevant part, that

in each district in which more than one voting machine is used, county board of elections shall, prior to each primary and election, appoint for each additional voting machine to be used in such district, one qualified registered elector of the county to serve as machine inspector therein for such primary or election. The qualifications of clerks and machine inspectors shall be the same as herein provided for election officers.

25 P.S. § 2674. The qualifications for election officers are set forth in Section 402(a) of the Election Code, 25 P.S. § 2672(a), and include being a "qualified registered elector[] of the district in which they are elected or appointed," and not having served in various government positions within the last two months prior to the primary or election. There is a slight conflict between these provisions, as Section 404 requires that a machine inspector be a qualified elector of the county and Section 402 requires that the election officer be a qualified elector of the district. This conflict has no bearing, however, on the issue before the Court.

39

take an oath, and the oath contemplates that the machine inspector must be in attendance at the primary or election. Section 410 of the Election Code, 25 P.S. § 2680.[21] Thus, any argument on the part of the County that Section 302(d)'s reference to machine inspectors or custodians in any way empowers it—much less obligates it—to hire post-election third parties in violation of the Secretary's report finds no support in the statutory provisions relating to those terms.

Third, county boards of elections must "make and issue such rules, regulations, and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, election officers[,] and electors." 25 P.S. § 2642(f). The language is clear that the county boards of elections may only issue such rules, regulations, and instructions that are **consistent with law**. It would be patently inconsistent with law for the County to issue rules, regulations, or instructions that would violate the Secretary's statutorily required report and attendant directives.

The County also relies on Section 302(g), which provides that county boards of elections are authorized to "inspect systematically and thoroughly the conduct of primaries and elections in the several election districts of the county to the end that primaries and elections may be honestly, efficiently, and uniformly conducted." 25 P.S. § 2642(g). In its Application, the County characterizes the Secretary's argument

---

[21] The oath is as follows:

> I (John Doe) do swear (or affirm) that I will as a machine inspector attend the ensuing election (or primary) during the continuance thereof, that I will in all things truly and faithfully perform my duty respecting the same to the best of my judgment and ability; and that I am not directly or indirectly interested in any bet or wager on the result of this election (or primary).

25 P.S. § 2680.

as "Section 1105-A(a) effect[ing] an implied repeal of the County's duties and powers[,]" specifically referencing its obligation to "inspect systematically and thoroughly the conduct of primaries and elections." (County's Appl. at 9.) The County repeatedly reproduces the text of Section 302(g). (*See, e.g.*, County's Appl. at 21 ("Further, the [C]ounty, not the Secretary, shall 'inspect systematically and thoroughly the conduct of primaries and elections . . . ."); *id.* at 23 (same).) First, read carefully, nothing in Section 302(g)'s text empowers counties to inspect the Secretary-approved EVSs themselves, or at least inspect them without consideration of the requirements of the Secretary's report governing the use of those EVSs. To the extent the language of Section 302(g) could be read to permit the type of post-election inspections the County wished to conduct, we agree with the Secretary that the County's broadly phrased power and duty in this regard is entirely compatible with the Secretary's authority under Section 1105-A to issue a report—along with directives and instructions—setting forth conditions for the safe use of the EVSs and to ensure their compliance with the other requirements of the Election Code. As the Secretary explains, Section 302(g) "does not permit counties to do whatever they want in the name of [] inspections [of state-certified voting equipment]. Rather, when counties purport to conduct inspections of **state-certified** electronic voting equipment, they must comply with the conditions of use prescribed by the Secretary[.]" (Secretary's Answer at 25 (emphasis added).) In other words, to the extent county boards of elections have the power to "inspect" EVSs after an election, those inspections would need to comport with the conditions imposed by the Secretary, through the statutorily authorized report and directives, intended to ensure that such equipment **remains** safe for use for future elections and compliant with the Election Code's requirements.

41

Finally, Section 302(i) obligates county boards of elections "[t]o investigate election frauds, irregularities, and violations of [the Election Code], **and** to report all suspicious circumstances to the district attorney." 25 P.S. § 2642(i). This provision is silent as to the manner in which a given county board of elections may investigate frauds, irregularities, or violations of the Election Code. And, so long as a county board of elections wishes to have its EVSs remain in a certified state, it must ensure that any such investigation complies with the Secretary's report, as clarified through directives. There is no conflict between a county board of elections' investigative function and the Secretary's power to make the report and issue directives outlining the parameters to ensure that EVSs remain safe for future use in elections and continue to meet the Elections Code's requirements for the safe and secure operation of EVSs.

### d.    *Irreconcilable Conflict*

Stepping back, we observe that none of the capaciously worded provisions of Section 302 require the county boards of elections to bring their powers and duties to bear in any way that is contrary to the Secretary's report and directives. Nothing in Section 302 **obligates** county boards of elections to perform their broadly-worded powers and duties in a particular way, and county boards of elections can comfortably perform each of those powers and duties while still respecting the Secretary's report and related directives with respect to an EVS. The two are harmonious.

But even if there was a conflict between Section 1105-A and Section 302, Section 1105-A would control. When a conflict between two provisions in a statute exists, the more specific provision trumps a more general provision, to the extent they conflict:

42

> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such provision shall prevail.

1 Pa.C.S. § 1933. Moreover, to the extent an irreconcilable conflict exists between provisions of a statute, the later-enacted provision prevails over the earlier. 1 Pa.C.S. § 1934.

As discussed above, the subsections of Section 302 cited by the County have remained unchanged since 1937. As is evident, Section 302 sets forth broad and **general** powers and duties. Section 1105-A, by contrast, deals in **particular** with EVSs, and the Secretary's unique prerogatives with respect to them. Thus, to the extent there might exist an irreconcilable conflict, "the special provisions[, i.e., Section 1105-A,] **shall prevail** and **shall be construed as an exception** to the general provision[, i.e., Section 302]." 1 Pa.C.S. § 1933 (emphasis added). The rule that the particular controls the general applies "unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail." *Id.* (emphasis added). Of course, here, the general provision **predates** the particular provision by at least four decades. Thus, even if there was a conflict, Section 1933 of the Statutory Construction Act resolves the conflict in favor of Section 1105-A controlling.

> E.  *Whether the County is entitled to reimbursement for having to replace the Voting Equipment under the Election Code.*

43

We next address whether the Secretary has established a clear right to relief regarding dismissal of Count IV of the Amended Petition for Review.

### 1. Arguments

The Secretary asserts that Directive 1 is not infirm in its declaration that the Secretary will not reimburse the costs of replacement equipment. The Secretary points out that the provision which might form the legal basis for a challenge to that provision of Directive 1, Section 1103-B(a) of the Election Code, 25 P.S. § 3035.3(a), expired as of December 31, 2020, "long before the Secretary issued Directive 1 on July 8, 2021. For that reason alone, [the County's] argument fails." (Secretary's Appl. at 81-82.) Further, the Secretary points to the purpose of Section 1103-B(a) "to modernize election infrastructure and ensure that the systems in use for the 2020 election cycle produced a voter-verifiable paper record[.]" (*Id.* at 82.) Toward that end, the Secretary issued directives requiring Pennsylvania counties to adopt EVSs capable of producing voter-verifiable paper records, so "it was sensible for the Commonwealth to provide funding for counties that had previously purchased or leased a [direct-electronic recording EVS] and were then compelled to move to a different system." (*Id.* at 82-83.)

The County does not address Count IV.

### 2. Applicable Law

Article XI-B of the Election Code was added in its entirety by Act 77 of 2019.[22] Section 1103-B provides:

> **(a) Determination**.--If the [D]epartment decertifies one or more voting apparatuses that are in use in any county of this Commonwealth, the

---

[22] Added by Section 3.1 of the Act of October 31, 2019, P.L. 552, No. 77, 25 P.S. §§ 3035.1-3025.12.

44

[D]epartment shall apply to the [A]uthority[23] **to issue bonds for reimbursements to each county for the cost of procuring new voting apparatuses**.

**(a.1) Issuance**.--Bonds may be issued in one or more series, and each series may finance reimbursement grants to one or more counties.

**(b) Terms.**—

(1) The [D]epartment, with the approval of the Office of the Budget, shall specify in its application to the [A]uthority:

(i) the maximum principal amount of the bonds for each bond issue; and

(ii) the maximum term of the bonds consistent with applicable law.

(2) The total principal amount for all bonds issued under this article may not exceed $90,000,000.

(3) The term of the bonds issued under this article may not exceed 10 years from the respective date of original issuance.

**(c) Expiration**.--For the purpose of this article, authorization to issue bonds, not including refunding bonds, **shall expire December 31, 2020**.

25 P.S. § 3035.3 (emphasis added).

3.     Analysis

We agree with the Secretary that he is entitled to relief on this point.  The Secretary's authorization to issue bonds to reimburse the county boards for decertified voting equipment, by the plain terms of Section 1103-B(c), expired on

---

[23] "Authority" is defined as "[t]he Pennsylvania Economic Development Financing Authority."  Section 1101-B of the Election Code, added by Section 3.1 of Act 77, 25 P.S. § 3035.1.

45

December 31, 2020, before he issued Directive 1.[24]  Accordingly, the language in Directive 1 providing that the Secretary will not reimburse those counties whose equipment is decertified for failure to follow its provisions does not run afoul of the Election Code.  The Secretary is entitled to summary relief with respect to Count IV of the Amended Petition for Review.

F.    *The effect, if any, of Fulton County I's reasoning on the disposition of these Cross-Applications.*

Next, we address the potential applicability of the coordinate jurisdiction rule.

### 1.    Arguments

The County relies, at least in part, on the reasoning of *Fulton County I*, in which a three-judge panel of this Court overruled the Secretary's preliminary objection to Count III of the Amended Petition for Review.  (*See, e.g.*, County's Appl. at 12-14.)  The Secretary, anticipating potential invocation of the coordinate jurisdiction rule, asserts that *Fulton County I* does not control because the law of the

---

[24] Notably, the Secretary is still authorized to issue "refunding bonds" past December 31, 2020.  25 P.S. § 3035.3(c).  However, a "refunding bond" is not the species of bond the Department would seek from the Authority to **reimburse** a county for voting equipment pursuant to Section 1103-B(a).  The definitional section of Article XI-A references the Economic Development Financing Law (Law), Act of August 23, 1967, P.L. 251, *as amended*, 73 P.S. §§ 371-387.  Section 6.3(b) of the Law, which was added by Section 3 of the Act of July 10, 1987, P.L. 273, provides that

> [t]he [] [A]uthority, whenever it deems expedient, shall have the power to refund any bonds **previously issued** by the [] [A]uthority or any other entity by the issuance of new bonds whether the bonds to be refunded have or have not matured. Refunding bonds shall be sold and the proceeds applied to the purchase, redemption or payment of the bonds to be refunded . . . .

73 P.S. § 376.3(b) (emphasis added).  Because refunding bonds only come into existence with respect to an already issued bond, it makes sense that authorization to **issue bonds** expires, but authorization to issue refunding bonds does not.

case doctrine permits overruling rationale from a previous disposition on preliminary objections in a case. (Secretary's Appl. at 75 (citing *Riccio v. Am. Repub. Ins. Co.*, 705 A.2d 422, 425 (Pa. 1997)).) Further, the Secretary insists that the *Fulton County I* panel held only that the court could not say **with certainty** as to Count III that the law would not permit recovery. The Secretary reiterates that "the preliminary[] objection opinion did not analyze the language in Section 1105-A(b) that expressly requires county boards of elections to 'comply with the requirements for the use of [EVSs] as set forth in the report by the Secretary[.'] . . . . Directive 1 merely interprets and clarifies those conditions . . . ." (Secretary's Appl. at 76 (quoting 25 P.S. § 3031.5(b)) (emphasis omitted).) Therefore, the Secretary takes the position that the coordinate jurisdiction rule poses no hurdle to a decision in his favor at the summary relief stage.

### 2. Applicable Law

Earlier this year, our Supreme Court clarified the coordinate jurisdiction rule in a case involving two decisions of this Court—one at the preliminary objections stage, and the other at the summary relief stage of the litigation. The Supreme Court explained that "judges of coordinate jurisdiction sitting in the same case should not **overrule** each others' decisions." *Ivy Hill Congregation of Jehovah's Witnesses v. Dep't of Hum. Servs.*, 310 A.3d 742, 754 (Pa. 2024) (citation and quotation marks omitted) (emphasis added). Our Supreme Court has previously put it this way: "the coordinate jurisdiction rule commands that upon transfer of a matter between trial judges of coordinate jurisdiction, a transferee trial judge may not alter **resolution of a legal question previously decided** by a transferor trial judge." *Zane v. Friends Hosp.*, 836 A.2d 25, 29 (Pa. 2003) (emphasis added). In *Ivy Hill*, the Supreme Court

explained the coordinate jurisdiction rule, a subset of the law of the case doctrine,[25] serves several ends: "(1) to protect the **settled expectations** of the parties; (2) to insure uniformity of decisions; (3) to maintain consistency during the course of a single case; (4) to effectuate the proper and streamlined administration of justice; and (5) to bring litigation to an end." *Ivy Hill*, 310 A.3d at 754. (citation and quotation marks omitted). "Departure from the coordinate jurisdiction rule" is permissible only when: "[(1)] there has been an intervening change in the controlling law[; (2)] a substantial change in the facts or evidence giving rise to the dispute in the matter[;] or [(3)] where the prior holding was clearly erroneous and would create a manifest injustice if followed." *Id.* (citation and quotation marks omitted). As part of the broader law of the case doctrine, the Supreme Court recognized "that a court involved in the later phases of a litigated matter should not reopen questions **decided** by another judge of the same court[.]" *Commonwealth v. Starr*, 664 A.2d 1326, 1331 (Pa. 1995).

The *Ivy Hill* Court also clarified that a change in procedural posture **alone** does not justify departure from the coordinate jurisdiction rule. In other words, the

---

[25] The law of the case

> doctrine refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter. . . . Among the related but distinct rules which make up the law of the case doctrine are that: (1) upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter; (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court; and (3) upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court.

*Commonwealth v. Starr*, 664 A.2d 1326, 1331 (Pa. 1995) (citations omitted).

mere fact that an earlier panel ruled on preliminary objections, and a later panel was ruling on summary relief, does not per se preclude application of the rule. *Ivy Hill*, 310 A.3d at 758 ("While a ruling issued at a different stage of the proceedings may give rise to one of the limited exceptions to the coordinate jurisdiction rule – for example, a change in the facts – it is the demonstration of the exceptional circumstance, not the distinct procedural posture, which renders the coordinate jurisdiction rule inapplicable.").

### 3. Analysis

We agree with the Secretary that the coordinate jurisdiction rule is not an impediment to our grant of summary relief in his favor. First, the *Fulton County I* panel was careful to emphasize that its reasoning was not definitive, but that "it [was not] **certain** that the County's challenge to Directive 1 . . . fail[ed] as a matter of law." 276 A.3d at 861 (emphasis added). The Court explained that the interplay between the Secretary's authority and the County's authority was "**not clear**." *Id.* (emphasis added). Indeed, though it believed the Secretary's position would "face[] many hurdles," the Court did **not** purport to definitively resolve the questions of statutory interpretation implicated in Count III. *Id.* at 862. Importantly, too, the Court explained that "[i]n [the Secretary's] claim of regulatory authority over the county boards of elections, **the Secretary has not engaged with the text and structure of Section 1105-A of the Election Code**," and that "omission, **in itself, prevent[ed] a ruling** in [the Secretary's] favor on [the] demurrer to Count III." *Id.* at 861 (emphasis added). Now, as evinced by its Application and extensive briefing, by contrast, the Secretary has indeed "engaged with the text and structure of Section 1105-A," and has persuasively argued that his interpretation is the correct one. *Id.*

The foregoing further illustrates that to the extent *Fulton County I* could be read to have definitively resolved certain statutory questions, those comments were dicta. To the extent we disagree with a prior panel's dicta, we are not overruling that panel's holding, and the coordinate jurisdiction rule is concerned with overruling **decisions** of prior judges of coordinate jurisdiction, *Starr*, 664 A.2d at 1331, not mere disagreement with their dicta. Our well-settled standard for ruling on a demurrer, as the *Fulton County I* Court acknowledged, is whether we can say "with **certainty** that the law will not permit recovery," resolving any **doubt** in favor of overruling the demurrer. *Commonwealth v. Monsanto Co.*, 269 A.3d 623, 635 (Pa. Cmwlth. 2021) (emphasis added). That a preliminary objection was overruled does not mean that the Secretary would never be able to demonstrate that a given legal question should be resolved in his favor.

Further, *Ivy Hill* is distinguishable because the preliminary objections opinion in that case purported to **definitively resolve** the nonjoinder and standing questions. *See Ivy Hill Congregation of Jehovah's Witnesses v. Dep't of Hum. Servs.* (Pa. Cmwlth., No. 316 M.D. 2020, filed June 17, 2021), slip op. at 13-14, 16-17, *rev'd* 310 A.3d 742. Issues like standing and nonjoinder of an indispensable party are of an inherently different vintage from the issue of a demurrer. If a party is determined at the preliminary objection stage to have standing, that party has a reasonable expectation that their efforts to continue litigating the case will not be in vain. A contrary ruling on that issue presents the very evil the coordinate jurisdiction rule is meant to prevent; specifically, protecting parties' settled expectations and ensuring consistency over the litigation. Here, in contrast, there should have been **no** such settled expectation, given the way the *Fulton County I* panel explicitly used language like "not certain" and "not clear," and noting that the Secretary, at that stage, not

50

having engaged with the text of Section 1105-A, "**in itself**" preventing the sustaining of the demurrer. *Fulton County I*, 276 A.3d at 861-62 (emphasis added).

Quite simply, the *Fulton County I* panel held that, at that point in the litigation, the Secretary had not yet demonstrated that Count III would necessarily fail and so declined to dismiss Count III at that time. Now, the Secretary has fully developed fulsome arguments that he is entitled to relief. We conclude that, unlike earlier, the Secretary has now established a clear right to relief, and the County has failed to do so. On these facts, there is no violation of the coordinate jurisdiction rule in the Court granting the Secretary summary relief on Count III.

> *G. Whether Count V is moot based on the Court's disposition on the other Counts of the Amended Petition for Review.*

This leaves Count V for the Court to resolve. Count V does not set forth an independent cause of action, but seeks a preliminary injunction undoing the decertification of the EVSs and the "withhold[ing of] funding" based on the County's contention that the Secretary acted without authority in issuing Directive 1. (Am. Pet. for Rev. ¶¶ 80-87, Wherefore Clause.) To the extent Count V requests an injunction regarding Directive 1's decertification and refusal to fund replacement EVSs based on that decertification, we conclude that this claim is moot, as our finding in the Secretary's favor as to Counts III and IV necessarily precludes the injunctive relief sought in Count V. Additionally, the fact that the County has disclaimed its intent to use the Voting Equipment again, and the reality that such equipment, now impounded, cannot be used, means there is a "change[] in the facts or in the law [] which [] deprive[s] [the County] of the necessary stake in the outcome" of whether the Voting Equipment remains decertified, thereby making this claim moot. *See Magnelli*, 423 A.2d at 804 (quoting *In re Gross*, 382 A.2d at 119). Based on the Court's legal determinations and the factual developments related to

51

the Voting Equipment, the Court cannot, "in substance, accord the [County the] relief" it seeks in Count V, and, as such, that claim is moot. *Toland*, 311 A.3d at 658.

## III.  CONCLUSION

In 1937, the Election Code gave county boards of elections many broadly worded powers and duties.  Later, as circumstances changed and technology advanced, the General Assembly amended the Election Code to give the Secretary an important role in ensuring statewide consistency and safety with respect to EVSs, requiring county boards of elections to comply with the Secretary's reports issued for the EVSs chosen by such boards, and granting the Secretary the authority to issue directives and instructions to ensure compliance.  There is, thus, a "complex balance of state and local power over elections and the equipment used in election administration" in order to protect and provide for free and fair and secure elections. *Fulton County II*, 292 A.3d at 1012.  There is no conflict between those provisions, and it is entirely possible—indeed necessary—for county boards of elections to fulfill their powers and duties while heeding the Secretary's report and directives. Read fairly, Section 1105-A empowers the Secretary to issue Directive 1, and nothing in Section 302, nor in the Elections Clause, suggests to the contrary.  The Secretary has, therefore, demonstrated a clear right to relief as to Count III of the County's Amended Petition for Review.  The Secretary also has demonstrated a clear right to relief regarding Count IV, as the Department's obligation to seek issuance of bonds for reimbursement relating to decertified voting equipment expired on the last day of 2020, before Directive 1 was issued.  Further, because the County no longer wishes to use the Voting Equipment at issue in this case and we

have granted the Secretary summary relief on Counts III and IV, Counts I, II, and V are moot.

The Secretary's Application is granted, and the County's Application is denied. Counts I, II, and V of the Amended Petition for Review are dismissed as moot. Judgment is entered in favor of the Secretary with respect to Counts III and IV.

_____
**RENÉE COHN JUBELIRER,** President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Fulton, Fulton County   :
Board of Elections, Stuart L. Ulsh, in   :
his official capacity as County   :
Commissioner of Fulton County and in   :
his capacity as a resident, taxpayer   :
and elector in Fulton County, and   :
Randy H. Bunch, in his official   :
capacity as County Commissioner of   :
Fulton County and in his capacity as   :
a resident, taxpayer and elector of   :
Fulton County,   :
                 Petitioners   :
  :
          v.   :   No.  277 M.D. 2021
  :
Secretary of the Commonwealth,   :
            Respondent   :

# O R D E R

**NOW**, December 31, 2024, Respondent's Application for Summary Relief is **GRANTED**, and Petitioners' Combined Dispositive Motion is **DENIED**. Counts I, II, and V of the Amended Petition for Review are **DISMISSED** as moot. Judgment is **ENTERED** in favor of Respondent and against Petitioners with respect to Counts III and IV of the Amended Petition for Review.

_____
**RENÉE COHN JUBELIRER,** President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Fulton, Fulton County : 
Board of Elections, Stuart L. Ulsh, : 
in his official capacity as County : 
Commissioner of Fulton County and : 
in his capacity as a resident, taxpayer : 
and elector in Fulton County, and : 
Randy H. Bunch, in his official : 
capacity as County Commissioner : 
of Fulton County and in his capacity : 
as a resident, taxpayer and elector of : 
Fulton County, : 
                Petitioners : 
                 : 
           v. :     No. 277 M.D. 2021
                 : 
Secretary of the Commonwealth, :     Argued: May 8, 2024
              Respondent : 

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge
             HONORABLE LORI A. DUMAS, Judge
             HONORABLE STACY WALLACE, Judge
             HONORABLE MATTHEW S. WOLF, Judge

DISSENTING OPINION
BY JUDGE McCULLOUGH              FILED: December 31, 2024

This case involves a straightforward question of law.[1] Here, the
Petitioners, asserting their reliance on the Secretary of the Commonwealth's

---

[1] Previously, in *County of Fulton v. Secretary of the Commonwealth*, 292 A.3d 974, 978 (Pa. 2023) (*Fulton County I*), the County of Fulton (County) was held in contempt by our Pennsylvania Supreme Court where, during the pleading stage of the present litigation, it allowed **(Footnote continued on next page…)**

(Secretary) 2016 Guidance, which recognized the ability of county boards of election to retain third-party vendors for election preparation tasks and security of election infrastructure, and Section 302 of the Pennsylvania Election Code (Election Code or Code),[2] arranged for an inspection of County's voting equipment subsequent to the 2020 General Election.

It was not until July 8, 2021, several months **after** Wake TSI's inspection and report to the County, that the former Secretary of the Commonwealth (Secretary) issued Directive 1, which prohibited county boards of elections from providing physical, electronic, or internal access to third parties seeking to copy and/or conduct an examination of state-certified electronic voting systems, or any components of such systems. Directive 1 also provided that the Commonwealth will not reimburse any cost of replacement voting equipment for which certification or use authority has been withdrawn pursuant to the Directive. Directive 1 clearly contradicted the former Secretary's 2016 Guidance and inappropriately formed the basis of the Secretary's retroactive penalization of the County for its inspection.

Nonetheless, the Majority concludes that the former Secretary acted within her authority when she issued Directive 1. In reaching its conclusion, the Majority not only misreads Section 1105-A,[3] it also has stripped other provisions of the Election Code of meaning, in particular Section 302(d), (g), and (i), which delegates to, and obligates, county boards of elections "[t]o investigate election

---

another third party (Speckin Forensics, LLC) to inspect the County's voting devices contrary to the Supreme Court's temporary protective order issued on January 27, 2022. The Supreme Court's decision in *Fulton County I* did not address the merits of the underlying Petition for Review or weigh in on whether the Secretary had authority to issue Directive 1 of 2021 (Directive 1) or the propriety of Wake Technology Services, Inc.'s (Wake TSI) initial inspection of the voting equipment at issue.

[2] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. § 2642.

[3] Added by the Act of July 11, 1980, P.L. 600, 25 P.S. § 3031.5.

frauds, irregularities and violations of this act" and to "inspect systematically and thoroughly the conduct of primaries and elections to the end that primaries and elections may be honestly, efficiently, and uniformly conducted." 25 P.S. § 2642(d), (g), (i).

The Majority also fails to allot sufficient weight to the Secretary's 2016 Guidance, which was in effect at the time of the County's third-party inspection, and that recognized the ability of county boards of elections to retain third-party vendors for election preparation tasks and security of election infrastructure. *See* Exhibit C to Petition for Review. The Secretary's 2016 Guidance states, "**if a county uses an outside vendor to perform any** of the election preparation tasks, the Department strongly recommends that the vendor follow these procedures as closely as possible." Exhibit C, Page 5 (emphasis added). The 2016 Guidance further recommends that county boards of elections exercise caution **in effectuating file transfers from third-party vendors** and that any access or transferring of files to a third party be conducted in a manner as secure as possible.

**Section 1105-A** of the Election Code **does not give** the **Secretary** the **authority to prohibit county boards** of elections **from inspecting** voting equipment following an election or to decertify a county's individual **voting devices** for use in future elections. Yet, the Secretary did so here **withou**t even performing an **examination** of the **voting system** pursuant to the Code to determine if the voting system continued to meet the requirements of the Election Code. Section 1105-A also does not give the Secretary the authority to impose *ad hoc* penalties upon county boards of elections. The Secretary's 2016 Guidance inherently and expressly recognized that it was the county boards' duty to inspect voting equipment.

Because Directive 1 was contrary to the Secretary's practices and deprived the County of its expressly permitted and delegated power under Section 302 to inspect, maintain, and investigate its own **voting equipment**, I would grant the County's Application for Summary Relief and declare that the Secretary's decertification of the County's **voting devices** was arbitrary, capricious, legally improper, and an error of law, as the Secretary failed to comply with the mandates of 25 P.S. § 3031.5(b).

## I.    Section 302

The Election Code confers duties on the county boards of elections which cannot be arbitrarily disregarded.  Section 302 of the Election Code makes the county boards of elections responsible for the honest, efficient, and uniform conduct of elections.  The **county boards of elections are empowered to purchase and maintain "election equipment of all kinds" and "appoint their own . . . voting machine custodians, and machine inspectors**." 25 P.S. § 2642(c), (d) (emphasis added). Incidental thereto, the county boards are empowered to **"make and issue such rules, regulations and instructions**, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, election officers and electors." 25 P.S. § 2642(f) (emphasis added).  The county boards are **required to "investigate election frauds, irregularities and violations of [the Election Code],** and to report all suspicious circumstances to the district attorney." 25 P.S. § 2642(i) (emphasis added).  Thus, it is a primary function of the County, not the Secretary, to "inspect systematically and thoroughly the conduct of elections" and "to investigate election frauds, irregularities, and violations" of the Election Code in its respective county.  *See* 25 P.S. § 2642(g) and (i).

I disagree with the Majority that its interpretation of Section 1105-A and its endorsement of Directive 1's prohibition against a county's inspection of its electronic voting devices can be reconciled with Section 302. Section 1105-A must be read together with Section 302. "Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa. C.S. §1921(a). Statutes that relate to the same subject "shall be construed together, if possible, as one statute." 1 Pa. C.S. §1932(b). All provisions of the Election Code are *in pari materia*. *In re Philadelphia County Board of Elections*, 73 A.2d 34, 36 (Pa. 1950). There is no language whatsoever in either Sections 1105-A or 302 that supports the Majority's conclusion that the Secretary can supervise the county boards of elections in the way they perform their duties under Section 302. I disagree that Section 302's silence as to the manner in which a county board of elections may investigate frauds, irregularities, or violations of the Election Code means that the Secretary can issue reports or directives that take that power away. I also disagree with the Majority's argument that here there is no conflict between a county board of elections' investigative function and the Secretary's power to outline the parameters to ensure that electronic voting systems remain safe for future use in elections and continue to meet the Elections Code's requirements for the safe and secure operation of electronic voting systems. The fallacy of that argument is this. On the one hand, the Majority says that a county board can "comfortably" perform its investigative powers as long as its investigation complies with the Secretary's report, as clarified through directives. The problem is that Directive 1 does not simply "outline parameters" or instruct the county election boards to do this and that. It literally **forbids** county boards of elections from performing any inspections on their voting devices, and in so doing, it outright **prohibits** the county election boards from conducting their investigation as they see

fit. So, the Majority's interpretations of the two provisions do, in fact, irreconcilably conflict. Moreover, the Secretary's **Directive 1** was issued **after** the County had already conducted its **investigation**, based in part on the Secretary's 2016 Guidance, which recognized such authority of counties to engage third-party vendors to inspect the counties' election devices.

When the County contracted with Wake TSI to conduct the inspection of its election devices after the November 2020 election, it was directly fulfilling its statutory obligations "[t]o investigate election frauds, [and] irregularities." 25 P.S. § 2642(i). By restraining counties from using third-party vendors from assisting them in such endeavors, Directive 1 has effectively obstructed the ability of county boards of elections to fulfill their statutory duties and obligations and is contrary to the 2016 Guidance.

## II.    Section 1105-A

The Majority finds support for the Secretary's actions in Section 1105-A, which addresses the qualification of electronic voting systems for use in Pennsylvania. It states in its entirety as follows:

> (a) Any **person** or **corporation owning, manufacturing or selling,** or being **interested** in the **manufacture or sale of,** any **electronic voting system,** may **request** the **Secretary** of the Commonwealth to **examine** such **system** if the **voting system** has been examined and approved by a federally recognized independent testing authority and if it meets any **voting system performance and test standards established by the Federal Government**. The costs of the examination shall be paid by the person requesting the examination in an amount set by the Secretary of the Commonwealth. Any **ten or more persons,** being **qualified registered electors** of this Commonwealth, may, at any time, **request** the Secretary of the Commonwealth to **reexamine** any **electronic**

**voting system** theretofore examined and approved by him. Before any reexamination, the person, persons, or corporation, requesting such reexamination, shall pay to the Treasurer of the Commonwealth a reexamination fee of four hundred fifty dollars ($450). The **Secretary** of the Commonwealth may, at **any time**, in his discretion, **reexamine** any such **system** therefore examined and approved by him. The Secretary of the Commonwealth may issue **directives or instructions** for **implementation of electronic voting procedures and for the operation of electronic voting systems**.

(b) Upon receipt of a request for examination or reexamination of an **electronic voting system** as herein provided for or in the event he determines to reexamine any such **system**, the Secretary of the Commonwealth shall examine the **electronic voting system** and shall make and **file** in his office his **report**, attested by his signature and the seal of his office, stating whether, in his opinion, **the system** so examined can be safely used by voters at elections as provided in this act and meets all of the **requirements** hereinafter **set forth**. If his report states that the **system** can be so used and meets all such requirements, such system shall be deemed approved and may be adopted for use at elections, as herein provided. With respect to any **electronic voting system** approved for use in this Commonwealth by the secretary, the report of the secretary shall specify the **capacity** of the **components** of that **system,** the **number of voters** who may reasonably be **accommodated** by the **voting devices and automatic tabulating equipment which comprise such system** and the number of clerks and machine inspectors, if any**,** required based on the number of registered electors in any election district in which the **voting system** is to be used**,** such **specifications** being **based** upon the **secretary's examination of the system**. Any **county** which thereafter **may adopt** any such **approved system** shall **provide the components of such system** in a number no less than that sufficient to accommodate the voters of that county or municipality in

accordance with the minimum **capacity** standards so prescribed by the secretary. The county board shall comply with the requirements for the use of the **electronic voting system** as set forth in the report by the Secretary of the Commonwealth.

(c) No **electronic voting system** not so approved shall be used at any election, and if, **upon the reexamination** of any such **system** previously approved, it shall appear that the **system** so reexamined can no longer be used safely by voters at elections as provided in this act or does not **meet the requirements hereinafter set forth**, the approval of that **system** shall forthwith be revoked by the Secretary of the Commonwealth, and that **system** shall not thereafter be used or purchased for use in this Commonwealth.

(d) **When** an **electronic voting system** has been so approved, no improvement or change that does not impair its accuracy, efficiency or capacity or its compliance with the requirements hereinafter set forth, shall render necessary the reexamination or reapproval of such system.

(e) Neither the Secretary of the Commonwealth nor any member of a county board of elections shall have any pecuniary interest in any **electronic voting system** or in any of the components thereof, or in the design, manufacture or sale thereof.

25 P.S. § 3031.5(a)-€ (emphasis added).

The Majority construes this section, which clearly pertains to the Secretary's **authority to approve entire electronic voting systems** for use in elections, to give the Secretary: (1) the sole power to make the decision whether there is a reason to conduct a post-election examination of a single electronic voting **device**; and (2) the power to regulate and penalize county boards of elections. The Majority's opinion rests on a clear error of law, namely the misinterpretation of Section 1105-A. The Majority concludes that the Secretary's authority to approve

electronic voting systems allows her to decertify the County's voting **devices**. I submit that this interpretation is based on a significant departure from the plain language of the statute, and it is certainly not derived from the plain meaning canon.

First, Section 1105-A relates to the procedures by which entire **electronic voting systems** can be approved or subsequently disapproved. Section 1105-A provides the Secretary with authority to approve vendors' electronic voting systems to make sure they comply with the specific federal testing and performance standards and the requirements set forth in the Election Code. For example, on January 17, 2019, the **Secretary approved and certified Dominion's Democracy Suite 5.5A,** which is a <u>**voting system**</u>, for use in Pennsylvania's elections. That was done pursuant to the Secretary's authority under this section.

The Majority reasons that, because the Secretary is authorized in Section 1105-A to issue "directives and instructions for implementation" of the use of electronic voting systems introduced into the counties prior to their certification and use in and by the counties, then by natural extension, she automatically has the power to issue directives regulating county boards in their use of voting devices including the power of decertification. In my view, this inferential leap of logic is belied by the legislature's deliberate wording of Section 1105-A. Section 1105-A speaks strictly in terms of the Secretary's authority to approve **electronic voting systems**. The term **voting device** appears once in Section 1105-A – and only in the context of what the Secretary must include in her report relative to her approval of an electronic voting system. **Nowhere does Section 1105-A authorize the Secretary to take any action in connection with a county's individual voting device, let alone to decertify it**. There is **no language** whatsoever that supports the Majority's interpretation that the Secretary's authority to reexamine electronic

voting systems in Section 1105-A **forecloses county boards of elections from inspecting their electronic voting devices with the assistance of third-party consultants.**

I believe one of the problems is that the Majority treats "systems" and "devices" as interchangeable words, in derogation of their statutory definitions. The fact that "electronic voting system" is defined[4] as "a system in which one or more voting devices are used to permit the registering or recording of votes and in which such votes are computed and tabulated by automatic tabulating equipment" does not change my view. When the term "electronic voting systems" in Section 1105-A is read in context, it is abundantly clear to me that **the legislature gave the Secretary authority to approve or disapprove entire <u>systems</u>, <u>not</u> the power to regulate the handling of individual voting devices or automatic tabulating equipment at the county level**. The reference to "system" in Section 1105-A corresponds with the dictionary definition of "system" as "a regularly interacting or interdependent group of items forming a unified whole."[5] Thus, when Section 1105-A refers to an "electronic voting system," and the Secretary's authority to approve of such, it refers not to the independent items, but to the unified whole.

Giving the Secretary authority to approve entire systems makes sense. There are different types of "electronic voting systems" including optical scanners, punch card systems, and direct recording electronic voting systems (DREs). The Supreme Court recognized this grant of authority in *Banfield v. Cortes*, 110 A.3d

---

[4] Section 1101-A of the Election Code, 25 P.S. § 3031.1, added by the Act of July 11, 1980, P.L. 600. By contrast, a "voting device" is defined as "an apparatus by which such votes are registered electronically, so that . . . the votes so registered may be computed and tabulated by means of automatic tabulating equipment." *Id.*

[5] "System." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/system. (Last visited December 30, 2024).

155, 159 (Pa. 2015), when it held that the Secretary had authority to approve DREs for use in Pennsylvania elections. **The legislature gave the Secretary the power to authorize or approve the use of kinds of systems** if she concludes that they meet the standards established by the Federal Government. If Section 1105-A meant to convey, what to me would be a very complex authority to regulate individual devices, the legislature surely would have made that clearer by including more references to "voting devices" and examples of what she can and cannot do with respect to those devices. Notably, Section 1104-A(a) of the Election Code requires **counties** to **acquire** and **install** "**components of an electronic voting system of a kind** approved" by the Secretary. 25 P.S. § 3031.4(a)[6] (emphasis added). Section 1104-A supports my view that the Secretary may issue instructions or directives about systems or types, not individual voting devices or "components."

Nor is the Majority's extra-legislative expansion of the Secretary's authority logical. The Majority reasons that because the Secretary has authority to approve electronic voting systems, she has the authority to issue directives to ensure that such equipment remains safe for use for future elections. The flaw in that argument is that the Secretary approves electronic voting systems, not individual devices. When the Secretary approves an electronic voting system for use in Pennsylvania under Section 1105-A, she is not certifying or passing upon the functionality or reliability of each individual voting device within the system. Therefore, I am at a loss to understand how she can declare that an individual device is no longer in a certified state simply because a third party has examined it to ascertain if it functioned properly during an election. It certainly is not unfathomable that a particular device may be defective or malfunction during an election. In fact,

---

[6] Added by the Act of July 11, 1980, P.L. 600.

the Election Code provides for this exact scenario in Section 1120-A (Unofficial ballot labels; repair and alternate use of paper ballots). In that case, it is the **county election board** that **is delegated the authority to oversee the repair of the device**.

> (b) **If any electronic voting system or any component thereof being used in any election shall become inoperable during such election, it shall, if possible, be repaired** or another machine substituted **by the custodian or county board of elections** as promptly as possible, for which purpose the county board may purchase as many extra systems or system components as it may deem necessary, but in case such repair or substitution cannot be made, paper ballots, either printed or written and of any suitable form, may be used for registering votes.

25 P.S. § 3031.20(b)[7] (emphasis added). Clearly then, **the legislature envisioned** situations where the **county boards** of elections may have **to examine and repair** a device. This section **does not forbid the use of third parties for such repair.** Clearly, **Directive 1**, which **forbids county boards** of elections from allowing third parties access to voting devices, runs directly contrary to this section. If the legislature intended to give the Secretary total oversight of all voting devices, then it could have, and would have, made that clear. Section 1105-A certainly does not do that.

Moreover, **the legislature** has **not conferred** such **rulemaking power upon** the **Secretary** anywhere in the Election Code. The county boards of elections are not bureaus within the Department of State subject to management by the Secretary of the Commonwealth. They are separate and standalone government agencies. By contrast, **the legislature** has expressly **vested county boards** of elections **with this power.** *See* Sections 1111(c) and 1110-A(d) of the Election

---

[7] Added by the Act of July 11, 1980, P.L. 600.

PAM - 12

Code, 25 P.S. §§ 3011(c), 3031.10(d)[8] (stating that county boards may make reasonable rules and regulations concerning the conduct of political party representatives present during election preparation). Yet, the Majority approves **Directive 1**, which in effect **forbids** county boards of elections from making the decision whether there is a reason to conduct an examination of electronic voting machines and penalizes the boards for directly fulfilling their statutory obligations "[t]o investigate election frauds, irregularities and violations of this act, and to report all suspicious circumstances to the district attorney." 25 P.S. § 2642(i). If the Majority's interpretation is accepted, we would be saying that the Secretary is the only person who should be unreservedly trusted in these situations, not the boards of elections or County Commissioners, whose hands are now tied by Directive 1. Finally, it removes oversight powers from the counties, which are now effectively frozen into inaction.

I find it extremely troublesome that the Majority has defended the Secretary's ability to decertify a voting device and withhold funding when the Code limits her authority to examine or reexamine to voting systems, not voting devices. I can find nothing in the Election Code that gives her such *carte blanche* authority over county election boards.

It is also important to consider that the Secretary issued Directive 1 several months **after** Wake TSI had already conducted an investigation of and assessment of the County's election equipment and issued its report on February 19, 2021. A "directive" that retroactively withholds funding from a county that it needs to acquire replacement voting devices, is not a directive at all. It is a post-hoc penalty. Directive 1 prohibited "physical, electronic, or internal access to third parties seeking to copy and/or conduct an examination of state-certified **electronic**

---

[8] Added by the Act of July 11, 1980, P.L. 600.

PAM - 13

**voting systems**" and provided for decertification of any system so examined. Here it is clear the **Secretary** not only overstepped her bounds, but **conflated** the examination of **electronic systems**, with **voting device** or **equipment**. This distinction in the Election Code is not without a difference. The County was inspecting its voting devices or equipment, for which it has clear authority, not the electronic systems, which is the duty of the Secretary. Moreover, the Directive was issued **after** Wake TSI's inspection and, according to the Secretary's July 20, 2021 letter, she acted pursuant to Section 1105-A to penalize the County (withholding funding) for something that had already occurred **before** Directive 1 was issued. Nothing in Section 1105-A or in the Majority's analysis supports the conclusion that the Secretary had such authority.

Accordingly, for these reasons, I am compelled to respectfully dissent.

_____
PATRICIA A. McCULLOUGH, Judge